Regina MOORE and Jerry
Dorning Appellants

v.

Richard ASENTE, Cheryl Asente
and Justin Lee Moore, a
Minor Appellees

and

Richard Asente and Cheryl
Asente Appellants

v.

Regina Moore, Jerry Dorning and
Justin Lee Moore Appellees

No. 2000–SC–1127–DG,
2001–SC–0325–DG.

Supreme Court of Kentucky.

June 12, 2003.

Rehearing Denied Aug. 12, 2003.

Glenda Harrison, Northern Kentucky Legal Aid Society, Inc., Covington, Stephanie Dietz, O'Hara, Ruberg, Taylor, Sloan & Sergent, Crestview Hills, Counsel for Appellants/Cross Appellees, Regina Moore and Jerry Dorning.

Mitchell A. Charney, Stephanie Morgan–White, Goldberg & Simpson, PSC, Louisville, Counsel for Appellees/Cross Appellants, Richard Asente and Cheryl Asente.

Thomas R. Willenborg, Covington, Counsel for Appellee, Justin Lee Moore.

W. Kimble Moore, Jr., General Counsel, Office of Counsel, Cabinet for Families and Children, Frankfort, Counsel for Appellee/Cross Appellant, Amicus Curiae, Kentucky Cabinet for Families and Children.

William Waverly Townes, Ackerson, Mosley & Yann, Louisville, Counsel for Appellee/Cross Appellant, Amicus Curiae, American Academy of Adoption Attorneys.

Andrew J. Ruzicho, Lexington, Counsel for Appellee/Cross Appellant, Amicus Curiae, Justice for Children Project.

Michael Ryan Voorhees, Phillips Law Firm, Inc., Cincinnati, OH, Suellyn Scamecchia, University of Michigan Law School, Ann Arbor, MI, Counsel for Appellee/Cross Appellant, Amicus Curiae, Hear My Voice.

Opinion of the Court by Justice KELLER.

## I. ISSUES

This appeal from a child custody action, which resulted from the breakdown of a proposed private adoption, presents three (3) primary issues. Regina Moore ("Moore") and Jerry Dorning ("Dorning") signed consents to allow Richard and Cheryl Asente ("the Asentes") to adopt their son, Justin. The consents, by their terms, would become irrevocable twenty (20) days from the date when Justin was placed with the Asentes. Before signing the consents, however, Moore and Dorning were advised by their attorney that they could revoke their consent to Justin's adoption at any time before their parental rights were terminated. Immediately before the termination of parental rights ("TPR") hearing, but more than twenty (20) days after Justin's placement with the Asentes, the birth parents announced their desire to revoke their consents. Did the consents become irrevocable twenty (20) days after Justin's placement? Because Moore and Dorning were misinformed of the legal effect of the consents and relied on this misinformation in signing the consents, the consents were not knowingly given and were thus invalid and unenforceable.

After holding that the consents were invalid, the trial court held that the Asentes lacked standing to pursue custody of Justin. Did the invalidity of the consents deprive the Asentes of standing to seek Justin's custody? Because the birth parents voluntarily placed Justin with the Asentes with the intention of and for the purpose of the Asentes' adoption of Justin, and because Justin remained with the Asentes for a significant period of time before the birth parents filed a proper legal action to regain his custody, we hold that under KRS 403.420(4)(b), Justin was in the "physical custody" of the Asentes rather than his birth parents when the Asentes sought custody. Accordingly, the Asentes had standing to make a claim for custody of Justin.

The trial court ruled that the birth parents' superior rights to Justin's custody

could be abrogated only by a showing of unfitness that would be sufficient to support an involuntary termination of their parental rights. Upon remand, must the Asentes demonstrate the birth parents' unfitness by clear and convincing evidence before the trial court could award them custody of Justin? Because we find that Moore and Dorning waived their superior rights to Justin's custody by placing him with the Asentes for the purpose of adoption, by filing a petition for the voluntary termination of their parental rights for the purpose of allowing his adoption, by signing a consent for the purpose of allowing Justin's adoption, and by allowing Justin to remain in the physical custody of the Asentes for a period of six (6) months before filing an appropriate legal action to regain his custody, we hold that the "unfitness" standard is inapplicable in this case. We therefore hold that, upon remand, when the trial court determines whether Moore and Dorning or the Asentes will have custody of Justin, the trial court should make that determination on the basis of Justin's best interest.

## II. BACKGROUND

This action began as a proposed interstate adoption arrangement between the Asentes, Ohio residents, and Moore and Dorning, Kentucky residents. The Asentes had previously adopted another child, Joey, born to Moore and Dorning. Thus, when Moore discovered that she was pregnant again, she contacted the Asentes to see if they were interested in adopting this child as well. The Asentes responded affirmatively and agreed to adopt the yet-unborn child that would later be named Justin.

Following Justin's birth on February 28, 1997, however, Moore and Dorning decid-ed they wanted to raise him themselves. They changed their minds about the adoption and notified the Asentes of their decision. In November 1997, however, Moore and Dorning again changed their minds and contacted the Asentes to determine if they still wished to adopt Justin. The Asentes once again responded affirmatively, and the proposed adoption process was set in motion.

To represent their interests in this proposed adoption, Moore and Dorning chose Thomas C. Donnelly ("Donnelly"), the lawyer who had represented them in the earlier placement of Joey with the Asentes. The Asentes agreed to pay Donnelly's fee for his representation of Moore and Dorning.

On December 16, 1997, and in accordance with their attorney's advice, Moore and Dorning jointly signed a form captioned "Application for Permission to Receive or Place a Child,"[1] which was prescribed by the Kentucky Cabinet for Family and Children as the initiating form to be signed by persons wishing either to adopt or to place a child for adoption in Kentucky. Moore and Dorning signed as placing parents and designated the Asentes as the persons whom they wished to adopt Justin. On January 12, 1998, Moore and Dorning signed, again jointly, a form captioned "Interstate Compact Placement Request,"[2] which is required when a child is to be placed for adoption or foster care in another state. Moore and Dorning signed as the sending persons and designated the Asentes as the persons with whom Justin was to be placed. Then on January 27, 1998, Moore and Dorning each separately signed a "Voluntary and Informed Consent to Adoption." These consents were

---

1. *See* KRS 199.473(1).

2. *See* KRS 615.030, Article III.

prepared by Donnelly, executed in his presence, and "[s]ubscribed, sworn to and verified and acknowledged to" before a notary public by Moore, Dorning and Donnelly. The consents read as follows:

### VOLUNTARY AND INFORMED CONSENT TO ADOPTION [3]

1. Comes [Regina Carol Moore/Jerry Lee Dorning], the birth [mother/father] of Baby Justin Lee Moore and the consenting person, and having been duly sworn does state under oath that [she/he] has been fully informed of the legal effects of this Consent. [She/he] understands that twenty (20) days after signing this Consent, that it shall become final and irrevocable.

2. [Regina Carol Moore/Jerry Lee Dorning] affirms that [she/he] has not been given or promised anything of value, except statutorily allowed expenses.

3. [Regina Carol Moore/Jerry Lee Dorning] affirms that [she/he] has not been coerced in any way to execute this Consent, and that the Consent is voluntarily and knowingly given.

4. [Regina Carol Moore/Jerry Lee Dorning] affirms that [she/he] is not under the influence of drugs, alcohol or any other medication which might influence [her/his] ability to make a decision.

5. [Regina Carol Moore/Jerry Lee Dorning] has chosen to be represented by independent legal counsel, Thomas C. Donnelly, Esq., 77 W. Villa Place, 1000 St. Jude Center, Ft. Thomas, KY 41075.(513)221–7722.

6. Justin Lee Moore, the child to be adopted was born on February 28, 1997 at St. Luke West Hospital in Florence, Kentucky and currently resides with his birth parents at 7 Indiana Drive, Covington, Kentucky 41015.

7. The identity of the prospective adoptive parents are [sic] Rich and Cheryl Asente, residing in the state of Ohio.

8. It has been explained to me by Thomas C. Donnelly, Esq. that this Consent to Adoption will be final and irrevocable twenty (20) days after the execution of the placement which was previously approved, if approval of a placement was required, and that this Consent will be final and irrevocable twenty (20) days after approval of the placement, if not already approved.

9. If the child is not adopted, it is my wish that I be contacted regarding any future plans for the child.

10. [Regina Carol Moore/Jerry Lee Dorning] affirms that [she/he] has or will receive a completed and signed copy of this Consent.

11. [Regina Carol Moore/Jerry Lee Dorning], the consenting person understands that this Consent may only be withdrawn by written notification sent by certified or registered mail, addressed to either the attorney for the consenting person or the attorney for the adoptive parents within twenty (20) days following the execution of the Consent. The attorney for the consenting person is: Thomas C. Donnelly, Esq. 77 W. Villa Place, 1000 St. Jude Center, Ft. Thomas, KY 41075. The attorney for the prospective adoptive parents is: John R. Gargano, Esq., 294 Harmon, NW, PO Box 1859, Warren, Ohio 44482–1859.

**3.** Although the parties do not question the substance of this document, we would observe that nowhere does the document explicitly state that a party signing it actually consents to the proposed adoption. Nonetheless, the caption and the context of the document's provisions make it abundantly clear that the document was intended to be a consent to an adoption.

12. This document was prepared by Thomas C. Donnelly, Esq., 77 W. Villa Place, 1000 St. Jude Center, Ft. Thomas, KY 41075.

13. This document was explained to the consenting person by [her/his] attorney, Thomas C. Donnelly, Esq.,

14. This Consent was executed at *3:00 p.m.* on the *27* day of *Jan.*, 1998 at *Star Bank Latonia.*

[Regina Carol Moore/Jerry Lee Dorning], the consenting person, hereby verifies that this Consent has been reviewed with and fully explained to [her/him].

*/s/ [Regina C. Moore/Jerry Lee Dorning]*

On February 17, 1998, both Kentucky and Ohio approved Justin's placement with the Asentes under the Interstate Compact on the Placement of Children ("ICPC").[4] On that same date: (1) the Asentes signed a document captioned "Legal Risk Statement," which warned, "until the parental rights [of] the birthparents have been terminated their adoption plan is at risk because the birthparents can revoke their consents"; and (2) Moore and Dorning physically handed Justin over to the Asentes. The Asentes then took Justin to his new home in Ohio where he has continued to live since that time with the Asentes and his biological brother.

On the following day, February 18, 1998, the Asentes' attorney, John Gargano ("Gargano"), in a letter to Donnelly, enclosed "two (2) consent to adopt forms[5] which [he] ... request[ed] that [Donnelly] have both [Moore and Dorning] execute so [he] [would] have the same to file in court here," requested that he be provided certified copies of the orders terminating the parental rights of both Moore and Dorning, and advised Donnelly that he would proceed with the adoption process in Ohio "[o]nce I have all of the documents in my possession...."

On March 9, 1998, Moore and Dorning signed a verified TPR petition.[6] A week later, the petition was filed in the Kenton Circuit Court, and a hearing on the petition was scheduled for March 26, 1998.[7] At this point, it appeared, on the surface, that the matters preliminary to the adoption were proceeding smoothly. However, this was only the calm before the storm.

On the hearing date—actually at the courthouse prior to the scheduled hearing—Moore and Dorning orally informed Donnelly that they had once again changed their minds regarding the adoption and that they wanted Justin returned to them. The hearing in the TPR action was thus cancelled. However, the TPR action itself was not dismissed at that time and remained pending.[8] Later that same day,

---

4. Verbal approval was given on February 17, 1998, and the written approval was signed by the Ohio compact administrator the following day.

5. Obviously, the "consent to adopt forms" referenced, and apparently enclosed, in this letter from the Asentes' attorney to the birth parents' attorney are not the January 27, 1998 consents, which are quoted above, that Moore and Dorning had signed three weeks earlier. The forms referenced in Gargano's letter were not filed in the record as exhibits. And, we assume, in accordance with the language of this letter, that Gargano had contemplated

using the enclosed "consent to adopt forms" for the Ohio adoption.

6. *See* KRS 625.040.

7. Although a copy of the TPR petition was filed in the custody action record, the record of the TPR proceedings is not a part of this record on appeal. Nonetheless, to the extent necessary, we have been able to glean the substance of those proceedings from testimony and documents filed in this record.

8. When birth parents change their minds prior to or at the termination hearing, a termi-

Moore called the Asentes and informed them that she and Dorning did not wish to proceed, and that they wanted Justin returned to them. Responding to Moore's phone call by letter dated that same day, Cheryl Asente pleaded with Moore to allow the adoption but also stated that "we understand that he is not ours until you take that final step. . . ." Then, on April 1, 1998, Moore called Virginia Smith, the Kentucky administrator of the ICPC, and informed her that she wanted Justin returned; however, Ms. Smith informed Moore that the consents had already become final and irrevocable.

On May 14, 1998, after it became apparent that the Asentes would not voluntarily return Justin, Moore and Dorning filed a motion in the TPR action requesting that Justin be returned to them.[9] After excluding the Asentes from participating in the TPR action on the grounds that they were not proper parties to that action, the trial court held a final hearing in the TPR action on August 17, 1998.[10] Also, on that day, Moore and Dorning filed the present action, a separate and independent action captioned "Petition for Immediate Entitlement or in the Alternative Petition for Custody" ("custody action" or "custody petition") with the Kenton Circuit Court.

The Asentes were named as respondents in the petition.

On September 4, 1998, the Asentes moved under CR 12.02(f) to dismiss the custody action filed by Moore and Dorning on the ground that the petition "failed to state a claim upon which relief can be granted because a claim for immediate entitlement of a child must be based upon a 'legally unwarranted deprivation' of the child." In support of their motion, the Asentes stated that since the child was placed with them pursuant to irrevocable consents signed by Moore and Dorning, "there has been no 'legally unwarranted deprivation.' " At the hearing on the motion, they further argued that (1) because of the consents, Moore and Dorning did not have standing to pursue the custody action, and (2) the trial court was without jurisdiction to resolve the question because, by placing Justin with the Asentes, Moore and Dorning had voluntarily transferred jurisdiction over Justin to Ohio.

On September 8, 1998, the trial court dismissed the termination action. But, subsequently, on September 24, 1998, the court, apparently *sua sponte*, entered an order in the termination action and found that the adoption consents signed by Moore and Dorning had been revoked.[11]

---

nation case is often left pending for a period of time to allow them to make a final decision. If the birth parents eventually decide to proceed with the termination, the cost and time associated with preparing and refiling a termination petition are thus avoided.

9. *See infra* note 10.

10. We assume that this hearing was for the purpose of finally determining whether Moore and Dorning wished to proceed with the termination of their parental rights. *See supra* note 8. In a voluntary termination case, if the trial court determines that parental rights are to be terminated, "it shall make an order terminating [the parent's rights] . . . and vest[ ] care and custody of the child in the

person, agency, or cabinet the court believe is best qualified to receive custody." KRS 625.043. But, if the trial court decides not to terminate the parent's rights, the statute contains no requirement that, or reciprocal authorization for, the trial court to make a custody determination at that time. As such, the trial court would simply dismiss the voluntary termination action. Regardless, because the Asentes were not allowed to participate in the TPR action, any order in that proceeding directing them to return Justin would be improper and unenforceable. *See infra* note 14.

11. We observe that: (1) the trial court's findings where somewhat obscured by the trial court's use during the proceedings of both the term "revoked" and the term "invalid," ap-

On October 21, 1998, the trial court [12] conducted a hearing on the Asentes' motion to dismiss, and the following day, the trial court, relying on the September 24, 1998 order in the termination action, determined that the consents previously executed by Moore and Dorning had been revoked and that Moore and Dorning, therefore, had standing to pursue the custody action. Finally, the trial court determined that it had jurisdiction over the matter and denied the Asentes' motion to dismiss the action.

On February 4, 1999, when the custody action came on for trial, the trial court announced that the consents had already been found invalid [13] in the termination action and that it would not allow the parties to relitigate that issue.[14] The court advised the lawyers that it would only "hear testimony on the consent issue as it goes to the standard [of proof]." [15] The trial court then heard limited additional evidence [16] regarding the validity of the consents.

parently interchangeably, with respect to Moore and Dorning's consents; and (2) although the trial court's jurisdiction to enter this order has not been raised as an issue on appeal, the trial court lost jurisdiction in the termination case ten (10) days after the entry of the final order dismissing the case, CR 59.05, and therefore, the September 24, 1998 order was void. *Commonwealth v. Gross*, Ky., 936 S.W.2d 85 (1996).

12. Because of a scheduling conflict on the part of Judge Patricia M. Summe, who presided over all of the other matters pertaining to this custody action, Judge Steven R. Jaeger presided at the hearing on the Asentes' motion to dismiss and entered the order of October 22, 1998. This was Judge Jaeger's only contact with the case.

13. Although the trial court used the term "invalid," a fair review of the complete record of the proceeding suggests that the trial court intended to refer to her earlier finding, during the TPR action, that Moore and Dorning had "revoked" their consents. And, although the trial court utilized the terms interchangeably, there is a clear difference between a finding that Moore and Dorning had revoked their consents and a finding that the consents themselves were invalid. Consent, otherwise valid, may still be revoked within the time period provided, but an invalid consent does not need to be revoked; it is simply invalid and without legal effect. In any event, we fail to see how the trial court's findings regarding the earlier-executed consents were relevant to the voluntary TPR action. Moore and Dorning had not filed an "Appearance–Waiver And Consent–To–Adopt," *see* KRS 625.041 (Form AOC–292), in the TPR action, and thus, when Moore and Dorning decided not to *voluntarily*

terminate their parental rights, that decision, in effect, terminated the voluntary TPR action before the trial court. KRS 625.042(6).

14. Because the Asentes were not parties to (and, in fact, were excluded by the trial court from any participation in) the voluntary TPR action, the trial court erred when it precluded the Asentes from litigating the validity and enforceability of the consents during the custody action. *Berrier v. Bizer*, Ky., 57 S.W.3d 271, 281 (2001) ("[C]ollateral estoppel applies only if the party against whom it is sought to be applied had a realistically full and fair opportunity to litigate the issue."). The Asentes, however, have not raised this issue before the Court.

15. Apparently, the trial court ruled that, if the consents were valid, the Asentes could retain custody of Justin by showing by a preponderance of the evidence that it was in the "best interest of the child" to award them custody, but, if the consents were invalid, then the Asentes would have to satisfy a much higher standard and would have to demonstrate the birth parents' "unfitness" by clear and convincing evidence.

16. We say "*additional* evidence" because, in making its determination in the custody action as to the validity of the consents, the trial court obviously relied on its determination in the TPR action, or at least upon evidence introduced in that action: "Thus, the consents executed on January 27, 1998 ... were void as a matter of law.... This determination was made, as the Court already noted, in the voluntary termination .... The Court has not been persuaded by testimony that its de-

After Moore and Dorning closed their proof, the Asentes began their proof by calling one witness—of the twenty-six (26) witnesses that they had identified in pre-trial pleadings—before calling Richard Asente to testify. Before questioning Richard Asente, however, the Asentes' lawyer, apparently as an afterthought, renewed his motion for a judgment on the pleadings.[17] At that point, the trial court granted a judgment for Moore and Dorning and terminated the proceeding without hearing any further witnesses from the Asentes:

> COUNSEL: I am going to call Mr. Asente.
>
> COURT: Mr. Asente.
>
> COUNSEL: Judge, before I call Mr. Asente I would like to renew my motion for a judgment on the pleadings based on the testimony that's already been given here today.
>
> COURT: I am inclined to grant your judgment on the testimony that's been given but I don't believe it's in your favor. I think that the consent was not informed and not voluntary, so your motion is granted. These young individuals were not informed of what this consent did. The issue as it relates to how that would or would not react in a different forum I think begs the question of whether I think that there needs to be scrutiny within the terms of the third branch of government which I think that it does. But

the true question becomes what is the meaning of an informed and voluntary consent and I have heard nothing from anyone including the expert and how those consents are signed that have changed the facts that these individuals did not make an informed and voluntary consent. My opinion with reference to that has not changed from the basis I utilize in voluntary termination but I would agree that now the choice of words is that the consent itself is not voluntary and therefore is not a valid consent as opposed to a revoked consent. So your motion is granted.

> COUNSEL: Does that mean that the proceedings are over for today?
>
> COURT: Based on your motion, your proceedings are over for today.

Following the hearing, the trial court, on February 11, 1999, entered its "Findings of Fact and Conclusions of Law, Judgment of Immediate Entitlement" ("immediate entitlement judgment"). In its findings of fact, the trial court accepted the testimony of Moore, Dorning, and Donnelly to the effect that Donnelly had informed (or, to be more accurate, misinformed) Moore and Dorning that they could change their minds about the adoption until the final hearing in the TPR action. Additionally, the court found that Donna Womack, the family services clinician who had interviewed Moore and Dorning on the day

termination was incorrect. In fact, the Court finds the testimony has strengthened that legal finding of fact. The Court will not procedurally reopen the consent issue for purposes of jurisdiction."

**17.** By labeling his motion one for "judgment of the pleadings" the Asentes' counsel likely misspoke. More than likely, the Asentes' lawyer was moving for an involuntary dismissal under CR 41.02(2), which is similar to a motion for a directed verdict, CR 50.01, but utilized in actions "tried by the court without

a jury . . . ." CR 41.02(2). Although a trial court may grant judgment for *the defendant* if "upon the facts and the law the plaintiff has shown no right to relief," *Id.*, a judgment for *the plaintiff* would not be appropriate at this point in the proceedings because the defendant has not yet completed his proof. *See id.* ("[T]he defendant, *without waiving his right to offer evidence in the event the motion is not granted,* may move for a dismissal . . . ." (emphasis added)).

they signed the adoption consents, indicated to them that they "could change their minds about agreeing to the adoption either before twenty (20) days passed after they signed consents to the adoption or until their parental rights were terminated by Circuit Court action, whichever their attorney and they chose to pursue." And, based on the February 18, 1998 letter from the Asentes' attorney to Donnelly, the trial court found "that the chosen procedure was to terminate the parental rights in Kentucky and proceed with the adoption in Ohio after the termination." The trial court then held that Moore and Dorning had not knowingly and voluntarily given their consents:

Because Petitioners were made to believe that their consent to the placement and adoption would not be final until their parental rights were terminated in a court proceeding, they never understood the consequences of executing the consent. Therefore, Petitioners never gave a knowing and voluntary consent to the termination or adoption. Thus, the consents executed on January 27, 1998, relying on this misinformation were void as a matter of law. As the consents are void, any acts taken on authority of those consents [are] likewise void, including the approval of the placement of the child with Respondents.

Accordingly, the trial court held that the consents were invalid for purposes of the custody action as well, concluded that Moore and Dorning were entitled to custody of Justin, entered a judgment granting "the petition for the immediate entitlement to the care, custody, and control of Justin," and assigned a hearing date, March 16, 1999, "to hear testimony regarding the fitness of the [Moore and Dorning]. . . ."

At the "fitness" hearing, the court again heard only limited testimony before terminating the hearing. The court then entered a judgment holding that the Asentes did not have standing to pursue custody of Justin:

The Court determines, pursuant to KRS Chapter 403 and KRS 405.020, natural parents are presumed to be fit and are entitled to custody of their children, and although the [Asentes] currently have physical possession of Justin they have no standing to present evidence of unfitness. In the February 9, [sic] 1999 hearing before this Court, [Moore and Dorning] were granted immediate custody, the [Asentes] had no established legal interests in Justin but merely a physical possession which the Court ordered continued pending its experts' advice on transfer concerns for Justin. Any such evidence concerning unfitness must be presented by one with legal custody, such as the Cabinet for Families and Children.

To further complicate this matter, on June 5, 1998, during the pendency of the Kentucky actions, the Asentes filed an adoption action in Ohio with the Trumbull County Court of Common Pleas, Probate Division ("Probate Court"). The issue that dominated the Ohio adoption action was whether Kentucky or Ohio had jurisdiction over Justin. On July 6, 1998, the Kentucky trial court in the TPR action ruled that it had jurisdiction, and on July 8, 1998, the Ohio Probate Court dismissed the adoption action pending before it on the basis that the Kentucky trial court had jurisdiction over whether the parental rights of Moore and Dorning were properly terminated under Kentucky law. An appeal was filed by the Asentes from the dismissal but subsequently dismissed by them.

In the meantime, the Asentes had filed a motion in the Probate Court for reconsideration of its dismissal of the adoption action, and after the dismissal of their appeal, the motion was granted. The As-

entes then filed a supplemental petition as well as a new petition for adoption in the Ohio Probate Court. On April 8, 1999, the Probate Court entered a judgment holding: (1) that Kentucky lacked jurisdiction; (2) that under the Uniform Child Custody Jurisdiction Act ("UCCJA") [18] and the Parental Kidnapping Prevention Act ("PKPA"),[19] that Ohio was properly exercising adoption jurisdiction; and (3) that the February 11, 1999 judgment for immediate entitlement issued by the Kentucky trial court "is not entitled to full faith and credit by the courts of the State of Ohio." The Probate Court then scheduled a hearing on the Asentes' adoption petitions. Moore and Dorning appealed this judgment, and the Court of Appeals for Trumbull County reversed the Probate Court and held that the Kentucky trial court's judgment "is entitled to full faith and credit in Ohio and is valid until such time as Kentucky determines that it no longer has jurisdiction or determines that [Moore and Dorning's] consent[s] to [the] adoption is no longer necessary." [20] The Supreme Court of Ohio subsequently affirmed this holding.[21]

The Asentes appealed from the Kenton Circuit Court's final judgment. Kentucky's Court of Appeals first addressed the jurisdictional issue and affirmed the trial court's determination that it had jurisdiction to enter its judgments and orders. Next, the Court of Appeals addressed the issue of whether the trial court erred in granting custody of Justin to Moore and Dorning. After concluding that Moore and Dorning signed informed consents, the Court of Appeals found "that the trial court clearly erred when it determined

that the consents were invalid," and "reversed in part and remanded for entry of an order dismissing Moore and Dorning's custody action."

Moore and Dorning filed a motion for discretionary review in this Court, and we granted both that motion and the Asentes' cross-motion for discretionary review, which argued that the Court of Appeals erred in its analysis of the jurisdictional issue and that the Court of Appeals's holding was supported by additional grounds that it did not reach on appeal. We affirm the Court of Appeals's holding that Kenton Circuit Court properly exercised jurisdiction in this matter, but find substantial evidence to support the trial court's ruling that Moore and Dorning did not knowingly sign their consents, and we therefore reverse the Court of Appeals's holding, which directed the trial court to dismiss Moore and Dorning's custody action. As to the issues presented in the Asente's cross-appeal, however, we agree that the trial court erred when it held that the Asentes lacked standing to seek custody of Justin, and we thus vacate the trial court's order that directed the Asentes to return Justin to Moore and Dorning, and remand the case to the Kenton Circuit Court for a hearing on Moore and Dorning's custody action. Because we find that Moore and Dorning have waived their superior rights to custody of Justin, we direct the trial court to adjudicate the rival custody claims under the best interest standard.

## III. ANALYSIS

### A. JURISDICTION

The Asentes assert that Kentucky does not have jurisdiction over this matter and

---

**18.** UNIF. CHILD CUSTODY JURISDICTION ACT (1968) (hereinafter "UCCJA").

**19.** Parent Kidnapping Prevention Act (PKPA), 8 U.S.C. 1738(a) (1980).

**20.** *See In re Adoption of Asente,* 90 Ohio St.3d 91, 734 N.E.2d 1224, 1235 (2000) (citation omitted) (adopting and attaching Ohio Court of Appeals's opinion as an appendix).

**21.** *Id.*

argue that jurisdiction properly lies with Ohio. This issue has been extensively litigated on both sides of the river—so much so, in fact, that trial courts, intermediate appellate courts and the Supreme Courts of both states will have now ruled on it. Both the Kenton Circuit Court and the Kentucky Court of Appeals ruled that jurisdiction was properly in the Kenton Circuit Court. Additionally, one Ohio Probate Court judge, Ohio's Court of Appeals for Trumbull County and the Supreme Court of Ohio ruled that a Kentucky court was "the proper forum in which to assert jurisdiction over this matter." [22] We agree with these decisions.

■ The Asentes first argue that Moore and Dorning transferred jurisdiction to Ohio under Article V of the ICPC, which provides in relevant part:

### RETENTION OF JURISDICTION

(a) The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which *it would have had if the child had remained in the sending agency's state,* until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. The sending agency shall continue

to have financial responsibility for support and maintenance of the child during the period of the placement. Nothing contained herein shall defeat a claim of jurisdiction by a receiving state sufficient to deal with an act of delinquency or crime committed therein.[23]

The Asentes argue that, because the "sending agency" in this case is Moore and Dorning,[24] once the consents became final and irrevocable, Moore and Dorning did not retain any jurisdiction over Justin. And, thus, because the Asentes did not reside in Kentucky, the Kenton Circuit Court was divested of jurisdiction. We find this argument without merit for two reasons. First, we hold that the ICPC does not apply to jurisdictional conflicts, but that "the term 'jurisdiction' as used in the ICPC merely refers to which party in an adoption proceeding has 'responsibility for a child's well-being.' "[25] Second, the Asentes' argument depends upon and presumes the validity of the consents, but, as discussed below in Part III(B), the trial court's finding that the consents were invalid is supported by substantial evidence.

■ The Asentes cite *In the Matter of the Adoption of Jarrett*[26] in support of their argument that the ICPC divested the Kenton Circuit Court of jurisdiction. Although *Jarrett* held that the biological mother's execution of a valid consent document in Pennsylvania transferred both the child and jurisdiction to New York under Article V of the ICPC, we would observe that *Jarrett* is clearly distinguishable. The version of the UCCJA enacted by

---

**22.** *Id.* at 1234.

**23.** KRS 615.030, Article V(a) (emphasis added).

**24.** Under the ICPC, "sending agency" includes "a person ... which sends ... or causes to be sent ... any child to another party state." KRS 615.030, Article II(b).

**25.** *In Re Adoption of Asente, supra* note 20 at 1231.

**26.** 230 A.D.2d 513, 660 N.Y.S.2d 916 (N.Y.App.Div.1997) (hereinafter *"Jarrett"*).

New York, unlike the one enacted in Kentucky, specifically excludes proceedings for adoption.[27] Further, we find that the UCCJA, which governs child custody proceedings, applies to jurisdictional conflicts in adoption proceedings because the result of an adoption is a transfer of custody.

The relevant parts of the UCCJA, as adopted by Kentucky,[28] provide as follows:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(a) This state is the home state of the child at the time of commencement of the proceeding, or had been the child's home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

(b) It is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least one (1) contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

(c) The child is physically present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent;

(d) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (a), (b), or (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction.[29]

In ruling upon the Asentes' motion to dismiss, the trial court in its October 22, 1998 order determined that Kentucky retained jurisdiction of this matter:

The instant action was filed within 6 months of the placement of the child in Ohio. Kentucky remains the home state of the child. It is in the best interest of the child that Kentucky retain jurisdiction because of the significant connections to Kentucky and the existence of substantial evidence within this state. The Respondents have no judicial decree or order placing the child within their custody or control.

■ We agree with the Kenton Circuit Court's determination that it had jurisdiction. The action filed by Moore and Dorning for immediate entitlement and custody is a "custody proceeding" under the UC-

27. *Id.* at 922 ("Parenthetically, we add that we disagree with the Pennsylvania court's construction of the Interstate Compact and point out that the Uniform Child Custody Jurisdiction Act, as enacted in New York (Domestic Relations Law art 5–A), unlike Pennsylvania [and Kentucky], specifically excludes 'proceedings for adoption' (Domestic Relations Law § 75–c [3] )").

28. KRS 403.400 -.620.

29. KRS 403.420(1).

CJA;[30] therefore, its provisions are applicable in determining jurisdiction. Justin was a resident of Kentucky on February 17, 1998, and prior to that time, he had lived with Moore and Dorning for more than eleven (11) months. Accordingly, while Kentucky was not Justin's home state[31] when the action was commenced, Kentucky "had been [Justin's] home state within six (6) months before commencement of the proceeding."[32] Therefore, Kentucky was properly exercising jurisdiction in this matter. Although at the time this action was commenced, Ohio could qualify as Justin's home state, Ohio had previously yielded to Kentucky, declined to exercise jurisdiction,[33] and recognized that Kentucky "is the proper forum in which to assert jurisdiction over this matter."[34] Accordingly, in addition to jurisdiction under KRS 403.420(1)(a), the Kenton Circuit Court had jurisdiction under KRS 403.420(1)(d) to enter its judgments and orders.

## B. CONSENT TO ADOPTION VERSUS TPR ACTION

■ The trial court focused—we feel mistakenly—on whether the "consents" executed by the birth parents were consents for the voluntary TPR action or for the proposed adoption action in Ohio. We observe that one of two courses is generally followed prior to the filing of an adoption petition. In one, the birth parents' rights are first terminated in a voluntary TPR action,[35] and the adoption petition, accompanied by a certified copy of the order terminating the parental rights,[36] is then filed. If this course is followed, the birth parents are not necessary parties to the adoption action since their parental rights have been terminated,[37] and the adoption action thus proceeds without further notice to the birth parents. The second course utilizes the birth parents' consent to the proposed adoption. The birth parents sign the consent to allow the adoption,[38] they

30. KRS 403.410(3) ("Custody proceeding" includes proceedings in which a custody determination is one "(1) of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings[ ].").

31. KRS 403.410(5) (" 'Home state' means the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least six (6) consecutive months, and in the case of a child less than six (6) months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six (6)-month or other period.").

32. The Asentes claim that although the petition was filed on August 17, 1998, no summons was issued until August 18, 1998, and therefore, the action was not commenced until that date. CR 3.01. In support of their claim, they have attached as an exhibit to their brief a copy of a summons dated August 18, 1998. This claim conflicts with the Kenton Circuit Court record before this Court,

and because the exhibit was not introduced at trial or included in the appellate record, it is not part of the record for our consideration.

33. The original Ohio probate judge declined to exercise jurisdiction over Justin and dismissed the adoption action after ruling that the Kenton Circuit Court had jurisdiction. He later disqualified himself from the case, and the new probate judge assigned to preside in the case granted relief from the order that denied jurisdiction in Ohio and ruled that Ohio was validly exercising jurisdiction in the adoption case. As previously noted, this ruling was reversed on appeal.

34. *In Re Adoption of Asente, supra* note 20 at 1234.

35. KRS 625.040 -.046.

36. KRS 199.490(2).

37. KRS 199.480(1)(b).

38. KRS 199.500(1).

are joined as necessary parties to the adoption action,[39] and they are served with summons.[40] Although the consents need not be filed with the adoption petition, they must be filed prior to the entry of the adoption judgment.[41] Because the consent to adopt becomes irrevocable after twenty (20) days,[42] this course has become increasingly popular in private adoptions, especially open adoptions.[43] Occasionally, both courses are pursued simultaneously because, under the first course, a birth parent must appear at the TPR hearing unless his or her appearance is waived,[44] and the birth parent has until the TPR hearing, which may be up to thirty (30) days after the filing of the petition,[45] to change his or her mind about terminating his or her parental rights and thereby allowing the adoption.[46] On the other hand, a properly executed voluntary and informed consent to adopt becomes irrevocable after twenty (20) days, and the action can proceed without any further action on the part of the birth parent. Accordingly, this has the practical effect of reducing the risk that the birth parent will change his or her mind about the adoption. Like the final order in a TPR proceeding, a valid adoption judgment terminates the parental rights of the birth parent.[47]

The trial court determined that the birth parents' consent was for the TPR action and not for the proposed adoption. While we doubt both the correctness and the legal relevance of this determination in the overall resolution of this case, we would note that consent for a voluntary TPR action differs significantly from the consent executed by the birth parents here.[48] The primary purpose of the consent provided for in a TPR action is to allow the

39. KRS 199.480(1)(b).

40. KRS 199.480(2).

41. KRS 199.490(2).

42. KRS 199.500(5).

43. Generally speaking, an "open adoption" is one where the birth parents continue to maintain a relationship with the child. Many private adoptions, especially where a grandparent or other relative adopts the child, are open adoptions.

44. KRS 625.041 (Form AOC–292).

45. KRS 625.042(1).

46. *See Van Wey v. Van Wey*, Ky., 656 S.W.2d 731, 738 (1983) (Vance, J., dissenting).

47. KRS 199.520(2) ("Upon granting an adoption, all legal relationship between the adopted child and the biological parents shall be terminated except the relationship of a biological parent who is the spouse of an adoptive parent"); *Wright v. Howard*, Ky. App., 711 S.W.2d 492, 494 (1986) (holding that "a judgment of adoption in and of itself terminates any meaningful legal relationship between the adopted child and its non-consenting party defendant natural parent ...."). Of course, unless a biological parent's parental rights have been previously terminated, *see* KRS 199.480(1)(b)(6), the biological parent or parents must be made a party defendant to the proceeding, KRS 199.480(1)(b), and a trial court may approve an adoption without the consent of the child's biological living parents only if the evidence supports the additional factual findings required by KRS 199.502.

48. *See* KRS 625.041(3):

(3) The parent may sign an appearance-waiver and consent-to-adopt form when the parent chooses not to attend a voluntary termination of parental rights proceedings. This form, prescribed by the Administrative Office of the Courts, shall:
(a) Contain a statement of acknowledgment and agreement, regarding the appearance at the proceeding, signed by the parent, counsel for the parent, and the cabinet. If the parent is a minor, the form shall also be signed by the guardian of the minor parent;
(b) Contain the parent's notarized signature;
(c) Contain any address to which the parent requests the final judgment be served.

action to proceed without the birth parents' attendance at the voluntary TPR hearing and this consent is required on a form (AOC–292) prescribed by the Administrative Office of the Courts. From a careful review of the record, we believe it more likely that the consent in this case was thought necessary to facilitate the placement of Justin with the Asentes prior to the termination of Moore and Dorning's parental rights in the TPR action, after which the adoption would then proceed in Ohio.[49]

## C. VOLUNTARY AND INFORMED CONSENTS

██ The crux of this appeal is the validity of the consents executed by Moore and Dorning. And, the consents' validity must be determined by whether Moore and

Dorning gave voluntary and informed consents,[50] which means:

[T]hat at the time of the execution of the consent the consenting person was fully informed of the legal effect of the consent, that the consenting person was not given or promised anything of value except those expenses allowable under KRS 199.590(6), that the consenting person was not coerced in any way to execute the consent, and that the consent was voluntarily and knowingly given.

Moore and Dorning do not contest that they voluntarily signed the consents, and because their own lawyer represented them, their consents are presumed to be voluntary and informed.[51] Additionally, the consents, as drafted, include matters that are required only in cases where a parent is not represented by counsel.[52]

**49.** Donnelly understood that "consents would be required before there would be placement." He advised Moore and Dorning that "you will be signing a consent. It's really for placement purposes. It's really to satisfy the interstate compact offices that there's an intent here, and that it's with termination of parental rights that your consent will become binding and irrevocable."

**50.** KRS 199.500(1) ("An adoption shall not be granted without the voluntary and informed consent of the living parents . . . .").

**51.** KRS 199.011(14) ("If at the time of the execution of the consent the consenting person was represented by independent legal counsel, there shall be a presumption that the consent was voluntary and informed.").

**52.** KRS 199.011(14):

In the event the person was not represented by independent legal counsel, the consent shall be in writing, signed and sworn to by the consenting person and include the following:
(a) Date, time and place of the execution of the consent;
(b) Name of the child, if any, to be adopted and the date and place of the child's birth;
(c) Consenting person's relationship to the child;

(d) Identity of the proposed adoptive parents or a statement that the consenting person does not desire to know the identification of the proposed adoptive parents;
(e) A statement that the consenting person understands that the consent will be final and irrevocable twenty (20) days after the execution of the consent if the placement was previously approved, if approval of the placement is required;
(f) Disposition of the child if the adoption is not adjudged;
(g) A statement that the consenting person has received a completed and signed copy of the consent at the time of the execution of the consent;
(h) A statement that the consenting person understands that the consent may only be withdrawn by written notification sent by certified or registered mail addressed to either the attorney for the consenting person or to the attorney for the adoptive parents, within thirty (30) days following the execution of the consent;
(i) Name and address of the person who prepared the consent, name and address of the person who reviewed and explained the consent to the consenting person, and a verified statement from the consenting person that the consent has been reviewed with and fully explained to the consenting person; and

Clearly, the consents are facially valid.[53]

Furthermore, the following facts are not disputed: (1) the consents clearly state that they "will be final and irrevocable twenty (20) days after approval of the placement"; (2) Moore and Dorning admitted that they read and understood the consents before signing them; (3) immediately before the birth parents signed the consents, Womack explained to them that the consents were irrevocable after twenty (20) days;[54] (4) Moore called Donnelly within the twenty-day revocation period and asked him about calculating the period; (5) Donnelly explained to Moore how the period was calculated; and (6) Moore and Dorning did not revoke their consents during the twenty-day revocation period.

Nevertheless, the trial court, relying upon the testimony of Moore, Dorning, and Donnelly, found that Donnelly unintentionally misinformed Moore and Dorning as to the legal consequences of signing the consents, that Moore and Dorning relied upon Donnelly's advice in signing the consents, and, as a result, that the consents were invalid because they were not voluntary and informed. The Court of Appeals, however, held "that the trial court clearly erred in its determination that the consents were not knowingly and voluntarily given" and thus held that "the trial court clearly erred when it determined that the consents were invalid."

■■■■ The Court of Appeals, however, was entitled to set aside the trial court's

---

(j) Total amount of the consenting person's legal fees, if any, for any purpose related to the execution of the consent and the source of payment of the legal fees.

We would note that the thirty (30) days allowed under subsection (h) for withdrawal of the consent is probably the result of a clerical error and that the time period was meant to be twenty (20) days. Judge James E. Keller, *Beware: Major Changes in Private Independent Adoptions*, Bench & Bar, Kentucky Bar Association, vol. 60, no. 3 (Summer 1996). This mistake was rectified in the 2001 Session of the General Assembly. 2001 Ky. Acts ch. 69, § 1. Additionally, we would mention that prior to the enactment of the "Voluntary and informed consent" provisions, KRS 199.011(14); KRS 199.500(5), a biological parent was allowed to revoke consent to adopt only upon a showing of sufficient reason for revocation. *Warner v. Ward*, Ky., 401 S.W.2d 62, 63 (1966), *quoting Skaggs v. Gannon*, 293 Ky. 795, 170 S.W.2d 12, 16 (1943)) ("If 'sufficient reason is shown there may be a revocation before final judgment.' ").

53. Although the consents do not state that the birth parents, in fact, consent to the proposed adoption, *see supra* note 3, Moore and Dorning do not argue otherwise. The Court of Appeals's mention of "the clear language of the consent forms" refers to the provision regarding the twenty-day revocation period.

54. Moore and Dorning have made reference to the investigation report Womack filed with her employer after interviewing them. The report contained a checklist which contained the following:

> B. During your interview with the respective parent, did you:
>
> . . . .
>
> 2. Explain that birth parents can change their minds about agreeing to the adoption until their parental rights have been terminated by Circuit Court action which may happen in a separate action before the applicants petition the court to adopt the child or as part of the court's action on the adoption petition, but the Cabinet cannot represent the birth parents in a legal action? YES

Womack testified, however, that this report form was outdated and that she specifically explained to Moore and Dorning that they would have twenty (20) days in which to revoke their consents if they signed the consent forms. The report was filed by Womack with her employer and was neither given to Moore and Dorning nor made available for their inspection. Thus, except to the extent that the report may constitute a prior statement *inconsistent* with Womack's trial testimony, KRE 801–A(1)(A), this report is of little probative value because Moore and Dorning could not have relied upon it.

findings only if those findings are clearly erroneous.[55] And, the dispositive question that we must answer, therefore, is whether the trial court's findings of fact are clearly erroneous,[56] i.e., whether or not those findings are supported by substantial evidence.[57] "[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion"[58] and evidence that, when "taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men."[59] Regardless of conflicting evidence,[60] the weight of the evidence,[61] or the fact that the reviewing court would have reached a contrary finding,[62] "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"[63] because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court.[64] Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal,"[65] and appellate courts should not disturb trial court findings that are supported by substantial evidence.[66]

**55.** 7 KURT A. PHILIPPS, JR., KENTUCKY PRACTICE, RULES OF CIVIL PROCEDURE ANNOTATED, Rule 52.01, comment 8 (5th ed. West Group 1995) (hereinafter "PHILIPPS").

**56.** CR 52.01 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *Commonwealth v. Harrelson*, Ky., 14 S.W.3d 541, 549 (2000) ("When the trial court makes findings of fact, a reviewing court will not disturb such findings unless clearly erroneous.").

**57.** *Commonwealth v. Deloney*, Ky., 20 S.W.3d 471, 474 (2000) ("If the trial judge's findings of fact in the underlying action are not clearly erroneous, i.e., are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion.").

**58.** BLACK'S LAW DICTIONARY 580 (7th ed.1999). *See also Kentucky State Racing Commission v. Fuller*, Ky., 481 S.W.2d 298, 308 (1972), *citing Blankenship v. Lloyd Blankenship Coal Company, Inc.*, Ky., 463 S.W.2d 62 (1970).

**59.** *Blankenship v. Lloyd Blankenship Coal Co.*, *supra* note 58 at 64 (emphasis in original omitted).

**60.** *City of Monticello v. Rankin*, Ky., 521 S.W.2d 79, 80 (1975) ("Although the city would have us accept its version of the conflicting evidence, it appears that the findings of fact made by the trial judge were supported by substantial evidence. They are, therefore, binding on appeal."); *Kentucky Commission on Human Rights v. Fraser*, Ky., 625 S.W.2d 852, 856 (1981) ("The rule in Kentucky is that if there is substantial evidence in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record.").

**61.** *Burke v. Burke*, Ky.App., 801 S.W.2d 691, 694 (1990) ("Nevertheless, 'when there is substantial evidence to support a verdict, though we of the courts may think it outweighed, we are compelled to uphold the jury's conclusions.' ").

**62.** *Urella v. Kentucky Bd. of Medical Licensure*, Ky., 939 S.W.2d 869, 873 (1997) ("Although fact finders may have reached differing conclusions in this case, there is clearly substantial evidence in the record to support the Board's finding that Urella knowingly made a false statement in view of the jointly introduced documents and Urella's own testimony."); *Bowling v. Natural Resources and Environmental Protection Cabinet*, Ky.App., 891 S.W.2d 406 (1994).

**63.** CR 52.01

**64.** *Bowling v. Natural Resources and Environmental Protection Cabinet*, *supra* note 62.

**65.** PHILIPPS, *supra* note 55 at Rule 52.01, comment 8.

**66.** *Kentucky State Racing Commission v. Fuller*, supra note 58, *citing H. Smith Coal Company v. Marshall*, Ky., 243 S.W.2d 40 (1951).

In the present case, the trial court accepted the testimony of Moore, Dorning and Donnelly to the effect that, on the basis of Donnelly's advice, Moore and Dorning believed that they had until the TPR hearing to revoke their consents and have Justin returned to them. It was within the trial court's discretion to believe these witnesses to the exclusion of other evidence. And, because these witnesses' testimony constituted substantial evidence to support the trial court's findings, the Court of Appeals erred, and improperly substituted its judgment for that of the trial court, when it disturbed the trial court's findings. As the Court of Appeals's improper factfinding regarding the validity of the consents is inextricably intertwined with its holding reversing and remanding the case with directions to dismiss Moore and Dorning's custody action, *we reverse the holding of the Court of Appeals as to the merits of the custody action.*

### D. CUSTODY ACTION

#### 1. STANDING

■ Based upon its conclusion that the consents were invalid, the trial court ruled that Moore and Dorning were entitled to the immediate custody of Justin.[67] The trial court then, however, assigned a hearing date "to hear testimony regarding the fitness of [Moore and Dorning] ...." Because the Asentes' custody claim remained pending, the appropriateness of the trial court's ruling that Moore and Dorning were entitled to immediate custody of Justin is questionable;[68] however, the trial *court allowed custody to remain with the* Asentes pending the "fitness hearing," and consequently, the status quo of Justin's custody was maintained pending the final resolution of all custody issues.

■ At the abbreviated fitness hearing, the trial court summarily ruled that the Asentes did not have standing to pursue custody of Justin and dismissed their custody claim. We find this ruling in error. "Standing" is "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right,"[69] or, in other words, "the right to bring an action in the first instance."[70] In Kentucky, a nonparent's standing to bring a custody action is governed by KRS 403.420(4)(b), which provides in relevant part:

> (4) A child custody proceeding is commenced in the Circuit Court:
>
> ....
>
> (b) By a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but

---

67. Although not argued, we are aware of the provisions of KRS 199.550 that provide for the return of a child not adopted "to the custody of the cabinet or such individual, institution, or agency"; however, this statute is not applicable to this matter for two reasons. First, it applies to a situation where a petition for adoption is dismissed or an adoption judgment is annulled. Neither event occurred in Kentucky in this case. Second, this statute "is designed to facilitate the re-establishment of the status quo where custody of a child had been awarded in prior court proceedings." *Hill v. Poole,* Ky., 493 S.W.2d 482, 484 (1973). That did not occur in this case either.

68. *Moore v. Dawson,* Ky., 531 S.W.2d 259, 263 (1975) ("Where a trial court has jurisdiction to determine not only immediate entitlement to custody but under KRS 403.260 continuing custody as well, the trial court should generally resolve all custody issues before ordering [the transfer of custody].").

69. BLACK'S LAW DICTIONARY 1413 (7th ed.1999).

70. *Posey v. Powell,* Ky.App., 965 S.W.2d 836, 839 (1998); *Williams v. Phelps,* Ky.App., 961 S.W.2d 40, 41 (1998) ("Standing is the right to appear and seek relief in a particular proceeding.").

only if he is not in the physical custody of one (1) of his parents[ ].[71] This language appears rather straight-forward, i.e., a nonparent has standing if the child is not in the "physical custody" of a parent. And, in the present case, because Justin was living with the Asentes in their home, it would seem to follow logically that they had "physical custody" of him and therefore standing to maintain an action for his custody. However, several courts, including the Kentucky Court of Appeals, have rejected the argument that "physical possession" alone gives standing to the nonparent.

In *Williams v. Phelps*,[72] a nonparent with whom a child was residing sought custody of the child, and the Kentucky Court of Appeals indicated that the nonparent's mere physical possession of the child did not confer standing on her but nevertheless held that the nonparent had standing "[b]ased upon all of these facts, under the unique circumstances of this case."[73] In *Henderson v. Henderson*,[74] the Montana Supreme Court, in addressing a statute that authorized the commencement of a child custody proceeding by a person other than a parent "only if [the child] is not in the physical custody of one of his parents,"[75] held that " '[p]hysical custody' is not limited to having actual, immediate control of the physical presence of the child . . . , but [r]ather, this phrase relates to the custodial rights involved in the care and control of the child."[76] In explaining its ruling, the Court stated that "[t]o interpret this phrase otherwise would allow a nonparent to file a petition for custody anytime the child is out of the physical presence of the parent or parents, even if for a few minutes, or under the watchful eyes of an authorized babysitter."[77] Twenty years later, in *Girard v. Williams*,[78] when the Montana Supreme Court again addressed the issue, it followed and further explained its earlier holding:

" '[P]hysical custody' for purposes of establishing standing . . . is not based simply on who has actual possession of a child at the time a custody proceeding is commenced. Rather, the 'phrase relates to the custodial rights involved in the care and control of the child.' " As a result, to establish standing, a nonparent must demonstrate that the child's parent has voluntarily relinquished his or her right to physical custody and must present evidence as to the duration of the separation between the parent and child.[79]

Similarly, in *In re A.W.J.*,[80] the court held that "[t]he determination that a parent

---

**71.** KRS 403.420(4)(b). As a matter of procedure, we would observe that, although the Asentes did not file a petition for custody of Justin, they sought custody in their response to Moore and Dorning's petition for immediate entitlement/custody. And thus, in order to prevail on their claim for custody, the Asentes must satisfy the standing requirements that would be necessary if they had initiated the custody proceedings themselves.

**72.** Ky.App., 961 S.W.2d 40 (1998).

**73.** *Id.* at 42.

**74.** 174 Mont. 1, 568 P.2d 177 (1977).

**75.** The statute, Mont.Code Ann. § MT ST 40–4–211, was subsequently amended to delete "but only if the child is not physically residing with one of the child's parents." 1999 Mont. Laws Ch. 414.

**76.** *Henderson v. Henderson, supra* note 74 at 179.

**77.** *Id.* at 179 (citation omitted).

**78.** 291 Mont. 49, 966 P.2d 1155 (1998).

**79.** *Id.* at 1162 (citations omitted).

**80.** 316 Ill.App.3d 91, 249 Ill.Dec. 522, 736 N.E.2d 716, 721 (2000) (citations omitted).

does not have physical custody of a child turns not on possession; rather, it requires a showing that the parent somehow has voluntarily and indefinitely relinquished custody of the child. However, not every voluntary turnover of a child will deprive the parent of physical custody."[81] The court then set forth factors to consider in determining whether a parent had physical custody. "[T]he court must consider such factors as (1) who was responsible for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physical possession of a child was acquired; and (3) the nature and duration of the possession."[82] The court in *Webb v. Charles*,[83] when construing a subsection that mirrors KRS 403.420(4)(b) almost to the word, held that " '[p]hysical custody' as used in the statute relates to the custodial rights involved in the care and control of the child,"[84] and "[p]hysical custody in this sense does not equate to having actual, immediate control of the physical presence of the child, rather it is the legal right to control the child."[85]

The phrase "physical custody" first appeared in KRS Chapter 403 with Kentucky's 1972 adoption[86] of the Uniform Marriage and Divorce Act ("UMDA").[87] The phrase was contained in subsection (d)(2) of the UMDA's jurisdictional section[88] (enacted in Kentucky as KRS 403.260 with subsection (d)(2) being enacted as KRS 403.260(4)(b)). Subsection (4)(b) of KRS 403.260 read exactly the same as the present KRS 403.420(4)(b), which is set out above. In 1980, however, Kentucky adopted the Uniform Child Custody Jurisdiction Act ("UCCJA"),[89] and the legislature repealed KRS 403.260[90] in its entirety but retained the language of its subsection (4)(b), the nonparent standing provision, as a subsection added to the UCCJA's jurisdiction section,[91] but also adopted the remainder of the UCCJA section.[92] Thus, subsection (4)(b) of KRS 403.260, which was enacted originally as part of the UMDA, is now contained in subsection (4)(b) of KRS 403.420, which was enacted as part of the UCCJA. There is the rub.

"Physical custody" was not defined in the UMDA, and accordingly, when the phrase first appeared in KRS 403.260(4)(b), it was not statutorily defined. However, the UMDA's requirement that the child not be in the physical custody of a parent was devised to protect the parental rights of custodial parents.[93] It was therefore logical for courts to define "physical custody" to mean more than mere physical possession. But, the UCCJA, which was not designed to protect

**81.** *Id.* (citation omitted).

**82.** *Id.* (citation omitted).

**83.** 125 Ariz. 558, 611 P.2d 562 (1980).

**84.** *Id.* at 565.

**85.** *Id., citing Henderson v. Henderson, supra* note 74.

**86.** 1972 Ky. Acts ch. 182, § 16.

**87.** UNIF. MARRIAGE AND DIVORCE ACT (amended 1973), 9A U.L.A. 159 (1990) (hereinafter "UMDA").

**88.** UMDA § 401.

**89.** 1980 Ky. Acts ch. 69.

**90.** 1980 Ky. Acts ch. 69, § 25.

**91.** UCCJA § 3

**92.** 1980 Ky. Acts ch. 69, § 3.

**93.** UMDA § 401, comment, 9A(II) U.L.A. 264 (1998) ("[T]his subsection has been devised to protect the 'parental rights' of custodial parents ...."); Lawrence Schlam, *Third–Party Standing in Child Custody Disputes: Will Kentucky's New "De Facto Guardian" Provision Help?*, 27 N. Ky. L.Rev. 368 (2000).

custodial parents' parental rights, but rather to "avoid jurisdictional competition and conflict with courts of other states in matters of child custody,"[94] did contain its own definition of "physical custody." Under the UCCJA § 2(8), enacted as KRS 403.410(8), "physical custody" is defined as "actual possession and control of a child[ ]."[95] And, thus, under a literal interpretation of the KRS 403.410(8) definition of "physical custody," mere possession of a child may suffice. If this definition applies, then a nonparent with mere physical possession of a child would have standing to seek custody. We hold, however, that simple physical possession, standing alone, is insufficient to confer standing to contest child custody upon a nonparent.

Kentucky's appellate courts have recognized not only that "parents of a child have a statutorily granted superior right to its care and custody,"[96] but also "that parents have fundamental, basic and constitutionally protected rights to raise their own children."[97] And, because we would necessarily abrogate those rights if

we were to resolve custody disputes on a "best interest of the child" standard after allowing the nonparent to obtain standing by mere possession of the child, we hold that "physical custody" for the purposes of establishing standing requires more than "actual possession and control of a child" at the time a custody action is commenced[98]—i.e., a showing "that the parent has somehow voluntarily and indefinitely relinquished custody of the child." This does not mean that every voluntary relinquishment will deprive a parent of physical custody and bestow standing upon a nonparent. In determining whether parents have relinquished "physical custody" in a manner that confers standing upon a nonparent, Kentucky trial courts—like other courts that have addressed this issue—should consider, among other factors: (1) how possession of the child was acquired by the nonparent, especially the intent of the parents at the time of their relinquishment of the child to the nonparent; (2) the nature and duration of the possession by the nonparent; (3) the age of the child when possession was acquired by the non-

---

94. UCCJA § 1 (codified as KRS 403.400).

95. KRS 403.410(8).

96. *Boatwright v. Walker*, Ky.App., 715 S.W.2d 237, 244 (1986); *Quisenberry v. Quisenberry*, Ky., 785 S.W.2d 485, 489 (1990) ("In *Davis v. Collinsworth*, Ky., 771 S.W.2d 329 (1989) ... we upheld the statutory principle in KRS 405.020 that a court would not award custody to a nonparent over the rights of a parent unless it was first proved that the parent was unfit ('unsuited to the trust'), even when to do so might be in the best interest of the child."); *Van Wey v. Van Wey, supra* note 46 at 735 (1983) ("KRS 405.020 establishes the initial right of the parent to custody of her child, but not the continuing right once custody has been relinquished."); KRS 405.020.

97. *Davis v. Collinsworth, supra* note 96 at 330 (1989) ("The due process clause of the Fourteenth Amendment to the United States Constitution has long been recognized to contain a substantive component that 'provides

heightened protection against government interference with certain fundamental rights and liberty interests.' The liberty interest at issue in this case, one of the oldest and most clearly established, is the interest of parents in the care, custody, and control of their children. Over the years, the United States Supreme Court has jealously guarded this right, and has not encroached on it absent some compelling reason." *citing Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)); *Sherfey v. Sherfey*, Ky.App., 74 S.W.3d 777, 781–82 (2002); *Greathouse v. Shreve*, Ky., 891 S.W.2d 387 (1995).

98. *Cf. Simpson v. Simpson*, Ky. 586 S.W.2d 33, 35 n. 1 (1979) ("A nonparent can not legitimately invoke the court's jurisdiction on the issue of custody by seizing a child from a parent prior to filing a petition for custody.").

parent and the child's age when the parents sought the child's return; (4) any visits by the parents during the nonparent's possession of the child; (5) any financial support by the parents during the child's stay with the nonparent; (6) the length of time between the relinquishment and the parent's efforts to secure the child's return; and (7) what efforts the parents made to secure the child's return. Although we recognize that these factors cannot be applied mechanically as a formula to generate a conclusive answer as to the nonparent's standing, we believe these factors are useful analytical tools. We further recognize that although factors (1) and (2) will usually have the most importance, the other factors may also impact upon the determination.

On the facts of this case, we conclude that the trial court clearly erred when it ruled that the Asentes lacked standing. Moore and Dorning voluntarily relinquished Justin to the Asentes for the purpose of adoption. In furtherance of the planned adoption, they filed an action to terminate their parental rights and to transfer Justin's custody to the Asentes. Although their consents to adopt are not enforceable and the TPR action was dismissed, these actions undoubtedly show that, when they handed Justin over to the Asentes, Moore and Dorning intended to relinquish custody indefinitely. Although

Moore subsequently called and sought the return of Justin, she did not do so until over a month later, and Moore and Dorning did not file this action to regain Justin's custody until almost six (6) months after Justin's placement with the Asentes. Based on these facts, we hold that Justin was in the "physical custody" of the Asentes, not Moore and Dorning, at the time this custody action was commenced, and therefore, the Asentes have standing to pursue Justin's custody. Accordingly, we hold that the trial court erred when it held that the Asentes lacked standing to pursue custody of Justin, and we therefore remand this matter to the trial court for it to conduct a hearing to determine custody.

## 2. STANDARD: "UNFITNESS" VERSUS "BEST INTEREST"

■ "Custody contests between a parent and a nonparent who does not fall within the statutory rule on 'de facto' custodians are determined under a standard requiring the nonparent to prove that the case falls within one of two exceptions to parental entitlement to custody. One exception to the parent's superior right to custody arises if the parent is shown to be 'unfit' by clear and convincing evidence. A second exception arises if the parent has waived his or her superior right to custody." [99]

**99.** 16 L. Graham & J. Keller, Kentucky Practice, Domestic Relations Law 21.26 (2nd ed. West Group 2003 Pocket Part) (hereinafter "Graham & Keller"). In 1998, the Kentucky legislature enacted what is commonly referred to as the "de facto custodian" act. 1998 Ky. Acts ch. 250 (codified in substantial part as KRS 403.270(1)). Under the act, " 'de facto custodian' means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year

or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services." 1998 Ky. Acts ch. 250, § 1(1)(a); KRS 403.270(1)(a). "Once a court determines that a person meets the definition of de facto custodian, the court shall give the person the same standing in custody matters that is given to each parent...." 1998 Ky. Acts ch. 250, § 1(1)(b); KRS 403.270(1)(b). Under 403.420(4)(c), a de facto custodian has standing to commence a custody action. The effective date of the act was July 15, 1998; therefore, whether the Asentes attained de facto custodian status un-

Under the first exception, the nonparent must first show by clear and convincing evidence that the parent has engaged in conduct similar to activity that could result in the termination of parental rights by the state.[100] Only after making such a threshold showing would the court determine custody in accordance with the child's best interest.[101] Under the second exception, however, if a waiver has been shown by clear and convincing evidence, the trial court shall determine custody between the parent and nonparent based on the best interest of the child.[102] "Waiver requires proof of a 'knowing and voluntary surrender or relinquishment of a known right.'"[103] However, waiver may be implied "by a party's decisive, unequivocal conduct reasonably inferring the intent to waive,"[104] as long as "statements and supporting circumstances [are] equivalent to an express waiver."[105]

Kentucky's appellate courts have recognized two circumstances that constitute a knowing and voluntary waiver of a parent's superior right to custody. *Van Wey v. Van Wey*[106] and *Boatwright v. Walker*[107] held, respectively, that once (1)

der the act is not an issue in this case. We would also add that estoppel has been proposed as a concept in custody contest between a parent and nonparent. Graham & Keller § 21.27.

**100.** Graham & Keller § 21.26; *Fitch v. Burns*, Ky., 782 S.W.2d 618, 620 (1989) ("This [parental] right may only be abrogated in an action involving a nonparent seeking custody by a showing of unfitness sufficient to support an involuntary termination of parental rights."), *quoting Boatwright v. Walker, supra* note 96 at 244; *Davis v. Collinsworth, supra* note 96 at 330 ("The type of evidence that is necessary to show unfitness on the part of the mother in this custody battle with a third party is: (1) evidence of inflicting or allowing to be inflicted physical injury, emotional harm or sexual abuse; (2) moral delinquency; (3) abandonment; (4) emotional or mental illness; and (5) failure, for reasons other than poverty alone, to provide essential care for the children.").

**101.** *McNames v. Corum*, Ky., 683 S.W.2d 246, 247 (1984) ("It is our holding that, before any court even considers the best interest of the child in an action involving parent and nonparent, except in unusual circumstances not present here, there must first be a showing that the parent is not a fit person to have custody."); *Chandler v. Chandler*, Ky., 535 S.W.2d 71, 72 (1975) ("Since there appears to be some confusion as to the nature of a parent's rights as against those of nonparents with respect to child custody, the rule is that not only must it be shown that the child's welfare will be better served under the custo-dy of the nonparent, but also it must be found that the parent is not a suitable custodian.").

**102.** *Greathouse v. Shreve, supra* note 97 at 390 ("[O]nly if the trial court is persuaded the evidence is clear and convincing that the natural father waived his superior custodial right under KRS 405.020, shall custody between the natural father and the maternal grandmother be decided based on what is in the best interests of the child."); *Shifflet v. Shifflet*, Ky., 891 S.W.2d 392 (1995).

**103.** *Greathouse v. Shreve, supra* note 97 at 391.

**104.** BLACK'S LAW DICTIONARY 1574 (7th ed.1999).

**105.** *Greathouse v. Shreve, supra* note 97 at 391.

**106.** *Supra* note 46 at 734 ("We agree with the trial court that, having found that the petition was initially voluntary, when the mother later attempted to revoke her consent, the court had a responsibility to consider the overall welfare of the child in deciding whether or not to permit such revocation.").

**107.** *Supra* note 96 at 244 (in a case where the natural mother sought to withdraw her sworn written consent to allow the adoption of her child and his return, the court held "[a]s both *James [v. James*, Ky., 457 S.W.2d 261, 263 (1970)] and *Bond [v. Shepherd*, Ky., 509 S.W.2d 528, 529 (1974)] point out, however, this superior right may be contracted away.

a voluntary petition to terminate parental rights to permit an adoption or (2) a voluntary, knowing consent to adoption, have "been executed, withdrawal, while permissible, nevertheless waives the parent's superior right to child custody, 'and the best interests of the child [then] takes precedence.' "[108] Whether a parent has waived his or her superior right to custody under KRS 405.020 is a fact-specific determination that should be made after consideration of all relevant factors.

■ Here, based on the undisputed material facts in this case, we conclude that Moore and Dorning waived their superior rights to custody of Justin. Although their consents to Justin's adoption were held invalid because of their mistaken belief that they had until the TPR hearing to withdraw them, the consents were otherwise voluntarily and knowingly signed by them. Their mistake as to when they could revoke their consent was cured when the trial court, in effect, allowed them to revoke their consents to the adoption. But the fact remains that Moore and Dorning voluntarily signed consents with the knowledge and the intent that the consents would facilitate Justin's adoption. That was their intention when they signed the consents and it was their intention when they signed the petition to terminate their parental rights. Even if they had effectively revoked their consents within the statutory twenty-day cut-off period, under the circumstances of this case, we would hold that Moore and Dorning had waived their superior rights because they contacted the Asentes, not once but twice (and on occasions that were several months apart), about the adoption. This was neither a spur of the moment nor a coerced decision by Moore and Dorning. They signed the necessary forms for Justin's placement with the Asentes for the express purpose of his adoption by them, and when placement was finally approved, they delivered Justin to the Asentes. At that time, the intentions of Moore and Dorning to permanently change the legal custody of Justin to the Asentes were clearly defined.[109] Moore and Dorning were unquestionably and knowingly proceeding with a course of action that would result in Justin being "considered for purposes of inheritance and succession and for all other legal considerations, the natural child of the [Asentes], the same as if born of their bodies," and terminating "all legal relationship[s] between [Justin and Moore and Dorning]."[110] Thereafter, they voluntarily and knowingly signed a petition for the termination of their parental rights and for the transfer of custody to the

Once such a contract has been executed, the natural parent has waived its superior right, and the best interests of the child take precedence as provided for in *Van Wey*." (citations omitted)).

**108.** *Greathouse v. Shreve, supra* note 97 at 391 (1995) (brackets in original). KRS 199.500(5)'s statutory cut-off for revocation of consent does not change the rule judicially formulated by this Court that, when consent has been given (even if it is subsequently revoked), custody should be *evaluated under* the best interest standard. *See* Graham & Keller § 26.7. Under Ohio law, a consent to adopt may be withdrawn prior to the entry of a decree of adoption if the court finds that the withdrawal is in the best interest of the child. *See* Ohio Revised Code § 3107.08.4. Because Donnelly practices in Ohio as well as Kentucky, this difference might explain why he advised Moore and Dorning that they had until the TPR hearing to withdraw their consents.

**109.** *Day v. Day*, Ky., 937 S.W.2d 717, 718 (1997) (holding that "[t]he initiation of … formal legal proceedings establishes a clearly defined point of time when the adoptive parents sought exclusive legal custody of [the child] and the termination of the parental rights of the biological parents.").

**110.** KRS 199.520(2).

Asentes for the purpose of his adoption upon the termination of their parental rights. Moore did not notify the Asentes of her change of heart regarding Justin's adoption until 37 days after Justin had physically been delivered to the Asentes. And, Moore and Dorning did not file this action to regain Justin's custody until almost six (6) months after turning him over to the Asentes. Under the circumstances, Moore and Dorning not only waived their superior right to the custody of Justin but are estopped from claiming otherwise.[111] We therefore hold that, upon remand, the trial court shall determine custody in accordance with Justin's present best interest.

## IV. CONCLUSION

For the foregoing reasons, we affirm the Court of Appeals's holding that the trial court properly exercised jurisdiction in this case, but reverse its holding as to the merits of the underlying custody action. We remand this matter to the Kenton Circuit Court for it to determine, based on Justin's best interest, whether custody of Justin should be vested in Moore and Dorning or the Asentes.

All concur.

WINTERSHEIMER, J., also concurs by separate opinion in which GRAVES, J., joins.

Concurring opinion by Justice WINTERSHEIMER.

I concur with the result achieved by the majority opinion, but I wish to state my additional views separately.

Many judges in the system have agonized over this case and sincerely applied their very best efforts to this matter. There may be genuine disagreement as to the law applicable to any set of facts. Judges and legal authorities of good will can legitimately disagree. The law is not a stagnant body of ancient wisdom, but rather a growing and developing tool used to govern our daily conduct in contemporary society with fairness and impartiality. Although caution must always be employed in applying the standard to individual circumstances, the application of the best interest of the child standard here is a positive step in the right direction.

GRAVES, J., joins this concurring opinion.

**111.** See Graham & Keller § 21.27 ("[A] party who leaves a child with another person for a lengthy period of time can expect that child to develop a strong relationship with the third party. Surely, ... the child's bonding and attachment to the third party should not be irrelevant to the outcome of the case. Parental rights are constitutionally protected from state interference on the assumption that the parent and child have congruent rights. When the rights of the parent and child diverge, however, the state's normal role is to guarantee the protection of the child's rights.").