RENDERED: FEBRUARY 3, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0264-ME

DAVID KHAZAI                                                                    APPELLANT

v.                  APPEAL FROM JEFFERSON CIRCUIT COURT
                    HONORABLE ANGELA JOHNSON, JUDGE
                    ACTION NO. 21-D-503524-001

ANITA AHMADI                                                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, JONES, AND McNEILL, JUDGES.

JONES, JUDGE: David Khazai appeals from a domestic violence order (DVO)

entered against him in favor of his former stepdaughter, Anita Ahmadi. In sum, he

argues the operative statutes that guided the family court's analysis are

unconstitutional; the family court failed to make sufficient findings of fact; and

that insufficient evidence supported the family court's decision.  We find no error and affirm.

## I.  FACTUAL AND PROCEDURAL HISTORY

On October 11, 2021, Anita Ahmadi moved the Jefferson Family Court for an emergency protective order (EPO) against her then-stepfather, David Khazai.  In her motion, she alleged:

> My mother has filed for divorce and he believes it is my fault.  He currently is stalking us, calling me, leaving threatening messages, saying he is going to kill me.
>
> ARMED + DANGEROUS → when my mother served the EPO he told the sheriffs he has no weapons but I was able to find 5.  I believe there may be more.
>
> There is a long history of abuse.  A couple incidents are documented through CPS.  I have received medical treatment before due to his abuse.  He has been physically abusive to me for the past 17 years.  He would use various objects to abuse me.  Many MANY threats of violence and killing me.

The family court granted Anita's motion that same day, and David was served with Anita's EPO the day afterward.  In relevant part, the EPO prohibited David from making any communication with Anita; directed him to remain at least 500 feet from her; and further restrained him from going within 500 feet of Anita's workplace.  On November 3, 2021, the family court amended the EPO consistently with an agreement of the parties, specifying it would remain in

force until February 9, 2022; and that if no violations of the EPO had occurred as of that date, then the EPO would expire.

However, when the family court revisited this matter during a hearing on February 9, 2022, Anita asserted David had committed several violations of the EPO since November 3, 2021. Accordingly, the family court kept the EPO in effect, and held a two-day evidentiary hearing to determine whether a domestic violence order (DVO) should issue. At the evidentiary hearing, the family court considered testimony from Anita and David, as well as Shahpar Shahab – Anita's mother and David's ex-wife. On February 16, 2022, when the hearing concluded, the family court granted Anita a DVO against David, effective for the next three years. The family court's handwritten findings underlying its decision were as follows:

> The ct. finds by the preponderance of the evidence that DV occurred and could occur again. Specifically, the ct. finds the Respondent inflicted fear of imminent physical harm when he threatened her, attempted intimidation and called incessantly.

This appeal followed. Additional facts will be discussed as necessary in the context of our analysis.

## II. STANDARD OF REVIEW

> Kentucky Revised Statutes (KRS) 403.740(1) provides that "[f]ollowing a hearing ordered under KRS 403.730, if a court finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again

-3-

occur, the court may issue a domestic violence order[.]"
KRS 403.720(1) defines "[d]omestic violence and abuse"
as "physical injury, serious physical injury, stalking,
sexual abuse, assault, or the infliction of fear of imminent
physical injury, serious physical injury, sexual abuse, or
assault between family members or members of an
unmarried couple[.]"

*Ashley v. Ashley*, 520 S.W.3d 400, 403-04 (Ky. App. 2017).

The preponderance of the evidence standard is satisfied
when sufficient evidence establishes the alleged victim
was more likely than not to have been a victim of
domestic violence. *Baird v. Baird*, 234 S.W.3d 385, 387
(Ky. App. 2007). . . . The standard of review for factual
determinations is whether the family court's finding of
domestic violence was clearly erroneous. [Kentucky
Rules of Civil Procedure (CR)] 52.01; *Reichle v. Reichle*,
719 S.W.2d 442, 444 (Ky. 1986). Findings are not
clearly erroneous if they are supported by substantial
evidence. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.
2003).

*Caudill v. Caudill*, 318 S.W.3d 112, 114-15 (Ky. App. 2010).

"[S]ubstantial evidence" is "[e]vidence that a reasonable
mind would accept as adequate to support a conclusion"
and evidence that, when "taken alone or in the light of all
the evidence, . . . has sufficient probative value to induce
conviction in the minds of reasonable men." Regardless
of conflicting evidence, the weight of the evidence, or the
fact that the reviewing court would have reached a
contrary finding, "due regard shall be given to the
opportunity of the trial court to judge the credibility of
the witnesses" because judging the credibility of
witnesses and weighing evidence are tasks within the
exclusive province of the trial court. Thus, "[m]ere doubt
as to the correctness of [a] finding [will] not justify [its]
reversal," and appellate courts should not disturb trial
court findings that are supported by substantial evidence.

*Moore*, 110 S.W.3d at 354 (citations omitted).

> "[I]n reviewing the decision of a trial court the test is not whether we would have decided it differently, but whether the findings of the trial judge were clearly erroneous or that he abused his discretion." *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982) (citation omitted). Abuse of discretion occurs when a court's decision is unreasonable, unfair, arbitrary or capricious. *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky. 1994) (citations omitted).

*Caudill*, 318 S.W.3d at 115.

### III. ANALYSIS

On appeal, David dedicates one sentence of his brief to arguing either KRS 403.730 or KRS 403.740 are "void for vagueness." It is unnecessary to address this point beyond stating it is improperly before us: David did not raise it below, nor has he ever notified the Attorney General of Kentucky about his contention. *See Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989) ("The Court of Appeals is without authority to review issues not raised in or decided by the trial court."); *see also Benet v. Commonwealth*, 253 S.W.3d 528, 532 (Ky. 2008) (citations omitted) (explaining "strict compliance with the notification provisions of KRS 418.075 is mandatory[,] meaning that even in criminal cases, we have refused to address arguments that a statute is unconstitutional unless the notice provision of KRS 418.075 had been fully satisfied.").

David also complains "[t]he Court's Order does not make reference to when David inflicted fear of harm, or how the threatened harm was imminent." However, David did not request additional findings. CR 52.04 states:

> A final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.

In other words, we are unable to reverse and remand for the failure of the trial court to be more specific.

Lastly, David argues there was insufficient evidence supporting the family court's findings that, pursuant to KRS 403.740(1), domestic violence and abuse occurred and may again occur.[1] This issue is subject to review regardless of

---

[1] In his seven-page brief, David offers little insight or discussion regarding the evidence adduced during the evidentiary hearing relative to the DVO, and he also focuses upon evidence the family court did not consider *at all*. For example, David insists "he had nothing to do with a website that had inappropriate pictures of Anita posted" during the effective period of the EPO, but it is unclear why he raises this point: Anita attempted to introduce evidence in this vein below, but the family court declined to accept her evidence after sustaining an objection from David; there is no indication from the record that the family court nevertheless based its DVO upon this "website"; nor, for that matter, does Anita address this issue in her appellee brief.

As an aside, Anita has moved this Court to strike David's brief as deficient in this respect. We have denied her motion by separate order but would have considered granting it had the record been more voluminous and the issues more complex. It is not the responsibility of this Court to search the record to find support for David's arguments, assuming it exists. *Smith v. Smith*, 235 S.W.3d 1, 5 (Ky. App. 2006). Nor is it the responsibility of this Court to research and make David's arguments for him. *See, e.g.*, *Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012).

the family court's lack of specific findings in its order. *See* CR 52.03. Nevertheless, we disagree.

Beginning with whether domestic violence and abuse *occurred*, the family court's focus was upon the history of Anita's relationship with David, which culminated into an incident in August 2021. When the family court granted Anita the EPO on October 11, 2021, Anita was twenty-two years old. Regarding Anita's prior history with David, Anita and Shahpar each testified that in the seventeen years Anita lived with David, David would make strict rules for her to follow and would meet any objection or disobedience from her with physical violence or threats of physical violence. Anita testified that the "actual physical" abuse occurred while she was a minor. She recalled, for example, being taken to urgent care when she was about six years old after David twisted and bruised her arm for acting up at the Philadelphia airport; and that when she was a child and acted up at home, David would place pencils between her fingers, then crush and grind them into her hand as a form of punishment. Anita and Shahpar testified that when Anita was ten years old, David purchased an expensive, Persian cat for her that she loved; and that he killed the cat shortly afterward because Anita failed to follow his rules regarding the cat.[2]

---

[2] Regarding the cat he allegedly killed, David testified:

Anita testified that on one occasion, while she was a freshman in high school and was sleeping in the car while David was driving her to school, David pinched her to wake her up; she shrugged him off; and that David consequently punched her "numerous" times on the back of her head with a closed fist hard enough that she needed her mother to take her home from school shortly thereafter. She testified that while she was still a minor, David would often lock her in the basement; would confine her to the basement in the summertime while she was off school and he was home; and that while he was at work over the summer, he would only permit her to be in the garage, where there was no food and only a garden hose as a source of water. Anita and Shahpar also testified, consistently with what Anita represented in her EPO motion, about two instances where child protective services had investigated David for allegedly abusing Anita. The allegations were ultimately unsubstantiated. Shahpar testified the allegations were reported by

---

DAVID: I did not kill the cat. This happened about twelve years ago or something like that. I took the cat and put it in another neighborhood. They know it and I know it.

COUNSEL: So, you got angry, and you got rid of the cat?

DAVID: I didn't get angry, so you're putting words in my mouth. This incident was happening over and over and over again, and we made a deal that if the cat keeps doing this, the cat is gone. It was an agreement.

individuals other than Anita and herself,[3] and that "if we were going to report, I'm talking about, we would have more than twenty cases now."

Anita testified David's actual physical abuse of her gradually subsided as she became older, adding that "since then I have been very careful to make sure to not do anything to cause a reaction from him again." However, as she and her mother further testified, David's abuse then became more psychological. Shahpar testified Anita needed to be constantly aware of David's comings and goings because if he caught Anita "not doing something" in the house, she would get in trouble with him; and he would threaten to kill Anita if she failed to complete household chores, timely answer her phone, or did not otherwise "stay in line." Anita testified:

> ANITA: He would say, if I take one step out of line, he would kill me, which he wasn't worried about. He said if he had to go to jail, so be it, he still wanted to make sure he could punish me.
>
> COUNSEL: About how frequently would you say he made threats like that?
>
> ANITA: Very frequently, as it was a very casual thing for him to say.
>
> COUNSEL: And how recently has he made a threat like that to you, directly to you?

---

[3] Anita testified one of the investigations had been prompted by the report of a pediatrician who had treated her after David had punished her by grinding pencils into her hand.

ANITA:  Directly to my face?  Right before he left for Turkey, which was in August of this past year, 2021.

David testified he frequently told Anita that he would kill her, but minimized his statements as being "a manner of speech," innocuous expressions of his frustration, and encouragement for Anita to (as he represents in his brief) "learn the right way to do things."  Notwithstanding his subjective intentions, Anita testified his statements scared her, and for objective reasons.  Recall, Anita attributed the lack of any physical abuse from David in her adult life to being "very careful to make sure to not do anything to cause a reaction from him again."  Both she and her mother testified about two recent incidents where care was *not* exercised, the first of which occurred on Christmas Day of 2020.[4]  Anita described it as follows:

> ANITA:  David was, um, fat-shaming and degrading [his biological daughter], and she stood up for herself, and they started verbally fighting.  And then because she stood up for herself, he chased her out of the house, saying "I'm going to beat your ass."  And I got in between them, and I was holding the door so that [his biological daughter] could escape the house while I was holding David back from going after her.
>
> COUNSEL:  Seeing that, how did that make you feel?

---

[4] David acknowledged an incident between his biological daughter and himself had occurred on Christmas Day of 2020, but his version of it was different from Anita's and more abridged.  He testified, "After she started screaming at me and calling me names, I asked her to leave the house."

ANITA:  It made me very scared, and it taught me not to ever say anything and object.

The second incident – which the family court ultimately determined over the course of its oral findings was an instance of David's prior domestic violence toward Anita – occurred shortly before David left for Turkey in August of 2021 for an extended business trip.  It was also, according to Anita, what prompted David to most recently state, at least directly to her face, that he would kill her. She testified:

> ANITA:  It was like six o'clock, I hadn't woken up on time to make his coffee and clean the kitchen.  He started screaming at me.  He said, pardon my language, "Get the fuck out of my house.  Get the fuck out of my life."  Um, which, when I for once stood up and said, "Why are you so upset with me?" which is when he lunged at me. Thankfully, my mother was there.
>
> COUNSEL:  Okay.  So, when you say, "lunged at me," what do you mean?
>
> ANITA:  He started coming at me and yelling at me.
>
> COUNSEL:  And did he hit you?
>
> ANITA:  Thankfully, no, but my mother was in between us and didn't allow that to happen.

Consistently with what is set forth above, Anita testified that before David left for Turkey, he forbade her from residing in his house any longer. Shahpar provided a consistent description of the August 2021 incident during her

-11-

own testimony, adding that she believed David would have physically injured Anita had she not intervened.[5]

We have discussed the evidence regarding whether domestic violence and abuse *occurred*. We now proceed to the evidence regarding whether it was likely to *reoccur*. Anita testified what eventually caused her to once again fear imminent physical injury from David – to the extent it warranted an EPO – was another of his death threats, this one made during the week David returned from Turkey. While David was in Turkey, Shahpar filed a petition to dissolve her marriage with him. Anita testified she was not involved with her mother's decision and did not wish to be involved with whatever ensued; but a few days after her mother had filed the petition, David called Anita from Turkey and, in a voicemail message introduced as evidence, he accused her of being ungrateful and motivating Shahpar to divorce him.

David returned from Turkey on the evening of October 6, 2021. On that date, Shahpar was granted an EPO against him. By then, according to Shahpar, she and Anita had vacated the marital residence and were in the process of finding an apartment. As to the threat that encouraged Anita to also seek an

---

[5] David, for his part, only acknowledged "yelling" at Anita during the August 2021 incident. To the extent that he further elaborated on the incident, he testified that by obligating Anita to make his coffee by 6 a.m., he was helping her to better herself; and that he was not angry with her, but "when you break your agreement, there is consequences."

EPO against David, Anita testified that on or about October 11, 2021, she was provided a recording of a conversation between David and one of her maternal aunts, spoken in Farsi, that had occurred earlier in the week; and that over the course of the recorded conversation, David had explained in detail his plan to "come after," "punish," and "kill" her for motivating Shahpar to divorce him.[6]

Anita testified this particularly scared her because David apparently believed she had defied him, and because she knew David well enough to know that her defiance would cause him to attempt to physically abuse her. Moreover, she feared how far he would take things this time because she and her mother were no longer appeasing him, and his constant refrain up to that point had been that he was unafraid of going to jail for punishing her. Anita was also aware David owned firearms, and – as she stated in her EPO petition, which she incorporated into her testimony – "when [her] mother served [her] EPO he told the sheriffs he has no weapons but [Anita] was able to find 5."

That said, the family court's basis for determining domestic violence was likely to reoccur – for purposes of entering its DVO – was the evidence of David's conduct toward Anita while its EPO remained in force. For example, the

---

[6] The recorded conversation between David and Anita's maternal aunt was never admitted into evidence because Anita was unable to secure the services of a Farsi translator. However, what Anita and Shahpar related about the recorded conversation was largely cumulative of and consistent with what they had already related about David's history with Anita; and in any event, while relevant to Anita's mental state in seeking her EPO against David, it was not the focus of the family court's analysis in granting Anita a DVO.

EPO prohibited David from making any communications with Anita; but, as the family court found, David disregarded the EPO's prohibition and called Anita incessantly. Substantial evidence also supported the family court's finding. Anita introduced call logs from her private and workplace telephones demonstrating that between November 12 through November 29, 2021, she received a total of twenty-four calls that had originated from what she testified were David's personal or workplace telephones; and that she continued receiving calls from those numbers as recently as January of 2022. Anita also testified that when she would answer these calls, all that she would hear from the caller would be "snickering" or breathing, which she recognized as David's.

David, for his part, admitted Anita and her mother were familiar with his personal telephone number and the phone numbers associated with his business. He admitted that no legitimate purpose would have justified any calls from his business to Anita's workplace on or after November 12, 2021. But, he denied having any control over a phone associated with a number ending in "7730" – a number that frequently appeared in the call logs Anita presented. He also denied making any calls to Anita on or after November 12, 2021, testifying:

> DAVID: Now, if a phone call, a hang-up is threat, okay.
> I'm yours.
>
> COUNSEL: Did, did you, are, did you call and do that?
>
> DAVID: No. Of course not.

However, the family court deemed Anita the more credible witness –

particularly after Anita impeached David regarding his representation that he had

no control over the phone associated with the number ending in "7730." In that

vein, during the evidentiary hearing, Anita introduced a recorded message that her

mother, Shahpar, had received from that number; and David admitted on cross-

examination that it was a recording of him singing along to a love song. When

pressed further about how a phone he claimed to have no control over had been

used to leave a recording of his singing in Shahpar's voicemail, David suggested

that the "7730" number might belong to a former acquaintance of his – an

individual he described as a manic-depressive quantum physicist with a messiah

complex – and that his acquaintance might have recorded him singing at some

point and decided, for reasons unknown, to send the recording to Shahpar. In its

oral findings at the conclusion of the evidentiary hearing, the family court

indicated that it did not believe David. Certainly, that was its prerogative.

The EPO also prohibited David from being within 500 feet of Anita.

However, over the course of its oral findings, the family court indicated David had

violated this directive, too. Specifically, the family court lent credence to Anita's

testimony that, shortly after she began driving home from work on November 16,

2021, David had followed her; and that when she later idled at what she testified

was the street around the corner from her workplace, David – who was driving the

-15-

opposite way – stopped his vehicle, rolled down his window, and purposefully glared at her from across the median that separated them. Much of this incident is undisputed because Anita introduced into evidence three pictures she had taken from her cellular phone on November 16, 2021, that depict David, from inside his vehicle and with his window rolled down, looking directly at the camera from a short distance away and from across a median. Additionally, the family court gave no weight to David's rebuttal that the incident was unintentional and had been a complete surprise to him, *i.e.*, he testified, "The window was down, I am driving, and I turn, and she's there and she's taking pictures."

As discussed, the family court issued oral findings at the close of its evidentiary hearing. After considering the evidence, it explained in relevant part:

> Did he inflict fear of imminent harm by his actions? So, to review the facts and what I've heard today and the other week, essentially there's a history of, the allegation rather is that there's a history of violence, the threat of violence, abuse, control. And not just to this particular petitioner, but her mother, her stepsister. And so, that knowledge to the petitioner, in addition to his most recent behavior, caused her to fear. That's her allegation, she feared imminent harm, given all of these things put together, the history of violence, the history of threats, the history of abuse, and then the most recent incident. He denies it, he says "no, I was just being a father, I was being tough on her so she could reach these heights." Um, "this is tough love so she could turn out to be whatever it is that she wants to be."
>
> And so, the court is then forced to look at credibility, and to weigh that. And then we have the witness, her mother,

-16-

the petitioner's mother. Her testimony was very similar to that of what the petitioner's mother's was, in that there's a history of domestic control and abuse in that home. So, back to the point where they were fearful that the respondent would find the petitioner idle; she had to be working all the time. Mother testified that she observed the particular incident where he threatened to harm the petitioner because she did not rise early enough to prepare his coffee. Obviously, his version of the events were different, it was not to make his coffee, but to better herself with the whole purpose of him, you know, "agreeing" as he put it, that she would rise early.

And then we have his testimony. There was evidence presented from the petitioner regarding these messages, voicemail messages, the singing. He denied that he had any control over a particular phone number, but then we hear the singing, and there was what the court found to be, um, and interesting explanation for why he's on the phone singing. Something about this gentleman that actually has the phone somehow recorded his singing and his sadness and forwarded it to the wife, and that's how we learned that he, first he said he didn't in fact have the phone number, then he said no, it was just that instance. The court does not find that persuasive, and finds that it was in fact his phone. He was sending those messages, he was sending them to the petitioner.

And so, the court has the discretion to believe one party over the other, one witness over the other, and quite frankly I believe the petitioner. The court believes that the petitioner has established by the preponderance of the evidence that domestic violence occurred and could occur again in the future. Specifically, the court finds that the respondent's behavior of calling her incessantly, of pulling up and staring at her with the purpose of intimidation, of threatening to kill her because she failed to rise timely, all of that culminates to a history and inflicted fear of imminent harm, and the petitioner, this

will be a three-year no-contact order, and he is not to have a gun.

Upon review, we find no instance of clear error. Consistently with what is set forth above, substantial evidence supported the family court's finding that David committed an act of domestic violence against Anita in August 2021. Likewise, substantial evidence demonstrated when, where, and how David violated the terms of the EPO; and it could be reasonably inferred from the willful and frequent nature of David's violations that, more likely than not, his violative conduct toward Anita – considering their shared history – was designed to place Anita in fear of imminent physical injury; that he succeeded in doing so; and that his behavior would continue if left unchecked.

## IV. CONCLUSION

David presents nothing indicating the Jefferson Family Court erred or otherwise abused its discretion by entering a DVO in favor of Anita. We therefore AFFIRM.

ALL CONCUR.

BRIEF FOR APPELLANT:

C. Thomas Hectus
Louisville, Kentucky

BRIEF FOR APPELLEE:

Samantha Jo Hall
Louisville, Kentucky