RENDERED: DECEMBER 19, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0136-MR

GARTH HARRIS                                                APPELLANT

v.
APPEAL FROM KNOX FAMILY COURT
HONORABLE LUCAS M. JOYNER, JUDGE
ACTION NO. 23-CI-00228

JASON BAKER; LESLEY BAKER;
AND BRIANNA INMAN                                          APPELLEES

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CETRULO, A. JONES, AND TAYLOR, JUDGES.

CETRULO, JUDGE: Garth Harris ("Father") appeals an order of the Knox Family Court which granted primary custody of his child to Jason Baker ("Jason") and Lesley Baker ("Lesley"). The family court held Father abused the Child, was an unfit parent, and that it would be in the Child's best interest for Jason and Lesley (collectively the "Bakers") to have primary custody. Finding the family court erred, we reverse and remand with instructions to grant Father custody.

# FACTS & BACKGROUND

On June 14, 2023, Brianna Inman ("Mother") gave birth to the Child in Barbourville, Kentucky. The Child was born out of wedlock and had been exposed to illicit substances due to Mother's drug use during the pregnancy. Father and the Bakers were all present at the hospital for the birth. At that time, Father and Mother were in a romantic relationship and living together, but Mother was not positive which of two men, Father or another man, was the biological father. During her pregnancy, Mother entered into an oral adoption agreement with the Bakers. Father was not involved in those adoption discussions, nor was his name included on the Child's birth certificate. The Bakers are not related to either Mother or Father; they were introduced to Mother through a mutual friend.

On June 15, the day after the birth, the Bakers initiated this civil action petitioning for temporary custody but did not name or serve Father with that petition. As previously mentioned, Mother and Father openly lived together, and Father was at the hospital. Father had at least a 50% chance of being the Child's father. Mother's affidavit submitted with the Bakers' petition for temporary custody stated she "knows of no person not a party to this proceeding who . . . claims to have visitation rights with the infant child[.]" The Knox Family Court granted the Bakers' petition.

While we do not have every exact date in the record on appeal, in early August 2023, Father contacted the Cabinet for Health and Family Services ("Cabinet") to determine paternity. This contact occurred less than 90 days after the birth of the Child. On September 1, Father initiated a paternity action in Whitley District Court. Within the following weeks, Father took a DNA test that confirmed his paternity. On December 5, the Whitley District Court granted Father's motion for summary judgment legally verifying his paternity.[1]

Meanwhile, on October 31, 2023, the Bakers initiated an adoption action.[2] In their petition for adoption, the Bakers stated, "No one has commenced a judicial proceeding claiming parental rights[,]" and "No one . . . has lived openly . . . with . . . the person designated on the birth certificate as the biological mother of the child." However, the petition also stated that Father "believes he could be the biological father of the child[,]" and the Bakers wished to proceed without his consent.

On January 4, 2024, Father moved to be added to this civil action as an indispensable party and moved for immediate sole custody. He alleged therein

---

[1] The Knox Family Court later took judicial notice of this December 5 summary judgment.

[2] The Knox Family Court later consolidated this civil action with the tangential juvenile and adoption actions, but those companion case records were not included in the record on appeal. Our review of the record indicates the family court intentionally consolidated the cases, but then believed it had discretion to pick and choose which findings and facts were binding to which case. Also, despite the fact that the Child was appointed a guardian *ad litem* ("GAL") in the companion cases, no GAL report was summarized or attached to this action.

that the Bakers were not permitting him visitation. With these motions, Father presented the DNA report confirming that he was the Child's biological father.

On January 26, the Knox Family Court held an expedited temporary custody hearing ("January Hearing") and took judicial notice of the DNA report establishing Father's paternity. The witnesses included Father, Mother, Lesley, and the Child's social worker with the Cabinet, Mr. Cole Frazier ("SW Frazier").

At the January Hearing, SW Frazier testified Father was actively pursuing custody of the Child and had been compliant since the case was opened with Father's request in September. SW Frazier stated Father passed a drug screen, properly prepared and supplied his home with childcare items, and followed all requests such as securing firearms and building a gate around a heater. SW Frazier recommended closing the case and giving Father permanent custody of the Child.

Father testified and stated he lived with Mother before and during her pregnancy, but the two were no longer dating. At the time of the birth, he was not sure if he was the Child's father but in August 2023, he contacted the Cabinet to establish paternity. He admitted he had prior struggles with alcohol but had been sober for 18 months. He stated he was currently drug and alcohol free and voluntarily submitted to drug screening. Father stated he had steady employment on a night shift at an automotive facility, lived in a stable home with his parents,

and was willing and capable of taking care of his child. He stated he had visitation with the Child in the months prior, but the visitation was supervised and lasted only two hours every Sunday at a restaurant. He asserted that the only visitations he missed were due to his illness or that of his child. He stated he would do "everything" he needed to do to get custody of his child. He asserted he never agreed to adoption.

On cross-examination, the Bakers asked Father why he waited approximately 90 days after the birth to take a DNA test. Father testified that Mother told him she did not know if he was the father. He stated he did not know how to navigate the legal system and felt "powerless" by the process. The Bakers asked him if he knew Mother was a drug user, and he admitted he did. The Bakers asked Father if he drove her to get drugs. He admitted to driving her around but to not always knowing what she was doing at those locations. More often, he stated, she would take his car while he was sleeping. Mother was unemployed during their relationship and Father stated he gave Mother money for groceries and household items, but she later admitted to him that she had been using the money for drugs. He admitted they had a tumultuous relationship but he had never been arrested for domestic violence.

Next, Mother testified. Like Father, Mother stated she lived with Father during her pregnancy. She admitted to having *one* other sexual partner and

was not confident which of the two men was the Child's father. She stated she was not employed during her pregnancy, but Father gave her an "allowance" of $80 per day that she used for household items and to "buy her medicine." She asserted Father knew she used her allowance to buy opiates and often drove her to get those drugs. She admitted that Father did not give her cash, but rather he transferred the money to her bank account, and she withdrew cash to buy drugs. She stated Father had seen her taking drugs and knew she was taking drugs "when he impregnated me." She stated that at the beginning of her pregnancy, Father suggested she get an abortion. She testified that she and Father had a volatile relationship, but acknowledged only *she* had been arrested for domestic violence. Mother stated that Father was present at the birth, but he did not overtly challenge the Bakers' presence. Mother stated Father was an angry person and would not make a suitable father. She admitted that she told the Bakers that Father "might" be the father of her child. Mother had signed a consent to adoption in September 2023.

Lesley then testified and stated she was currently employed at the Knox County Clerk's office. She stated she spoke with Mother three or four times during her pregnancy about a possible adoption. Lesley stated Mother told her she did not know who fathered the Child, and contrary to Mother's testimony, she said Mother did not identify Father as potentially being the Child's father. Instead, Lesley only knew that Father was Mother's "boyfriend" but not how long the two

had been dating. She admitted he was at the hospital, but they did not include him in the petition for temporary custody nor seek his consent. When he contacted them, she admitted that Father requested additional unsupervised visits with the Child, but she refused to leave "her child" with someone she did not know.

After hearing all the testimony, the family court stated the question before it was "simple" and "straightforward," and its role was to determine "the best interests of the child." The family court recessed to review its notes and "the statute," and indicated its intent to make a final determination that day.

Shortly thereafter, the hearing recommenced, and the family court stated its belief that Kentucky Revised Statute ("KRS") 403.270 was controlling, and the "best interests of the child" would be served by leaving the Child with the Bakers as they have been the primary caregivers since the Child's birth. *The family court did not find Father "unfit" and acknowledged Father did not waive his rights to the Child.* The court ruled that Father was not aware of Mother's "adoption" plan. Still, the family court stated it was not in the "best interests of the child" to be placed with Father because, during Mother's pregnancy, he (1) suggested abortion, (2) provided Mother the financial means and transportation to continue her drug use during her pregnancy, and (3) delayed in seeking a paternity test.

The family court orally granted "joint temporary custody," but placed the Child with the Bakers and only allowed Father limited visitation. The family court ordered Father's visitation to be supervised until he completed parenting classes and ordered his visitation to increase incrementally to eventually include unsupervised weekend visits. Lastly, the family court ordered Father to attend two Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") meetings each month.

Before the family court could adjourn, Father objected. He referenced his superior rights but also challenged the family court's legal standard. Father argued that since he initiated paternity proceedings less than six months after the Child's birth, the Bakers did <u>not</u> qualify as *de facto* custodians, and therefore, the "best interest of the child" standard was not applicable. Father aptly requested additional findings.

In response, the family court again expressly stated it was *not* making a finding that the Bakers were *de facto* custodians; it was *not* making a finding that Father was unfit; and it was *not* making a finding that Father waived his rights; still the family court determined the Bakers had "possession" of the Child, and these "possessory" rights gave them "standing."[3]

---

[3] The family court determined the Bakers received "standing" due to (a) Mother's waiver of her parental rights and (b) Mother's affidavit that included the statement she did not know who the father was. The family court stated the Bakers were under no obligation to conduct "a world-

On February 1, the family court entered a written order ("February Order"). This February Order again stated that "KRS 403.270 [wa]s controlling and create[d] a best interest of the child standard." The family court determined the best interest of the Child was to stay with the Bakers while allowing Father limited visitation. Again, the family court ordered Father to attend NA or AA meetings and to take parenting classes.

The February Order observed that Father voluntarily submitted to a paternity test, cooperated with the Cabinet, attended regular visitations with the Child, maintained employment, and had the financial capability to take care of the Child. The February Order stated Father "appeared without any mental or physical health issues." The family court made no findings as to domestic violence. The Order stated Father "misled" the court regarding his sobriety and, based *solely* on Mother's testimony, the court believed Father consumed alcohol "during the first half of 2023[.]" The court did not elaborate as to why Father's possible consumption of alcohol was improper. The court disparaged Father for (1) mentioning abortion early in the pregnancy, (2) providing Mother with money despite knowing she used some of the money for drugs, (3) driving her around

_____

wide" search to find the Child's father and thus, the Bakers were properly before the family court as parties.

despite knowing she was sometimes buying drugs during those trips, and (4) for waiting approximately two months before seeking a paternity test.

On May 24, the family court held a "final custody" hearing ("May Hearing"). During the May Hearing, the family court took judicial notice of the testimony from the previous January Hearing and "consolidated" this action with the companion juvenile and adoption cases. However, those proceedings are not part of our record on appeal.

SW Frazier did not testify. Instead, another Cabinet social worker testified, noting that she was assigned the case the week prior and that SW Frazier wrote the Cabinet report submitted that day. This report, again, recommended placement of the Child with Father. This social worker testified that Father had worked his case plan successfully, and she had no concerns about the Cabinet's recommendation after her recent home visit with Father.

Lesley testified the Child lived with her and Jason during the week and with Father on weekends. She stated the Child becomes upset during exchanges with Father and acts hungry and tired when he returns. She testified that Father returned the Child late on two occasions. After one visit, the Child had a bruise on his head, which Father brought to her attention and admitted to not knowing what caused the bruise. She also stated that Father showed up twice with

the Child's car seat facing the wrong direction. She acknowledged Father attended two doctor appointments with her and the Child during her custodial time.

Next, one of Lesley's cousins testified, but she did not have any firsthand experience or knowledge about Father beyond one occasion when she witnessed the Child acting upset during a custody exchange. The Bakers also called their pastor to testify, but he likewise lacked any firsthand experience or knowledge pertaining to Father.

Father testified that he was still employed but recently obtained a new job on day shift because the night shift position interfered with his parenting. He acknowledged that the Child got fussy during exchanges but calmed down shortly thereafter. Father agreed with counsel that Mother had abused the Child in utero by using drugs. The Bakers' legal counsel pressed Father to admit he had abused the Child by providing transportation and money to Mother during the pregnancy and while knowing she was using drugs. Father denied the allegation and again stated that he did not know she was using the money for drugs until later.

Father stated he does not text the Bakers often during the week, because he trusts they are taking care of his child; and, he does not always respond when the Bakers text him on the weekends, because he is busy interacting with the Child. Father stated the Child did get a bruise once and he was not positive how

that happened, but he or his mother are always with the Child during his parenting window and the Child was safe.

Father testified his delay in attempting to attain custody was due to his confusion in the legal process. He began the process in August, following the Child's birth in June. He stated he followed the family court's orders by attending AA meetings twice a month every month and completing a parenting class (where he learned the correct way to install a car seat). Father had not missed a single visitation opportunity since the last hearing and had provided clothes, toys, and food for his child while he is with him. Father asserted that when he has the Child, they play at the park, tummy time, and games at home, and often the Child falls asleep in his arms while watching cartoons. Father stated his new job allows him a flexible schedule to take time off for the Child's doctor visits or other necessities. He asserted the Child interacts with Father's family including his parents, his brother, and his brother's children. He again reiterated that he is willing and capable of taking care of his child.

After closing arguments, the family court stated it had very serious concerns about Father's actions *prior* to the birth of the Child, and as will be discussed, clearly based its subsequent ruling on Father's pre-birth behavior. In October 2024, the family court entered an order ("October Order") awarding the Bakers sole custody of the Child and decreasing Father's visitation, only allowing

him visitation every other weekend.  In this October Order, the family court acknowledged its misapplication of the law in the previous order but nonetheless emphasized factors that weighed heavily in the Bakers' favor.[4]  The October Order found Father's pre-birth behavior equated to abuse by other than accidental means and now concluded he was an unfit parent.  All the evidence the family court utilized to support its determinations of abuse and unfitness was presented at the January Hearing, prior to the February Order that lacks equivalent findings.

For instance, the October Order criticized Father for waiting "months, albeit perhaps less than ninety (90) days, before taking any action or pursuing [DNA] testing."  The family court noted Father's tardiness to two exchanges prior to the January Hearing.  The family court suggested that Father *intentionally attempted to terminate Mother's pregnancy* by enabling her drug use.  In particular, the court stated, "[Mother] testified that [Father] wished for the pregnancy to be terminated . . . and it is not a great leap that his participation in [Mother's] drug use was to effectuate that result."[5]  In sum, the court based its

---

[4] The family court overtly gave weight to the fact that the Child was "loved dearly by [the Bakers], their families, and their church community."  The family court gave credence to the Bakers' choice to bring the Child "to church for weekly services;" noted that while the Child sometimes fussed during exchanges with the Father, the Child "is held by church members with no issue;" and the Bakers' pastor testified that the Bakers were "excellent caretakers[.]"

[5] This determination was based solely on Mother's testimony in January that Father suggested she get an abortion early in her pregnancy.  Mother did not testify in May.  However, Lesley admitted Mother had recently messaged her and stated "she'd committed perjury" in January.

October finding of unfitness on concluding that Father abused the Child by providing Mother with means of transportation and financial support that assisted her prenatal drug use.

Father filed a timely motion to alter, amend, or vacate the October Order pursuant to Kentucky Rule of Civil Procedure ("CR") 59.05. In December, the family court "overrule[d] the motion to vacate" and did *not* substantively change the custody determinations in the underlying judgment. Father appealed.[6]

## STANDARD OF REVIEW

Trial courts are vested with broad discretion in custody and visitation matters. *Futrell v. Futrell*, 346 S.W.2d 39 (Ky. 1961); *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000). In the absence of an abuse of discretion, we will not disturb a trial court's decision. *Young v. Holmes*, 295 S.W.3d 144, 146 (Ky. App. 2009). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citation omitted); *see also Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky. 1994) (discussing abuse of discretion in broader context of judicial authority).

> Because termination decisions are so factually
> sensitive, appellate courts are generally loathe to reverse

---

[6] An order denying a CR 59.05 motion is not the appealable order because it does not alter the underlying judgment; it is the underlying judgment that is the appealable order. *See Ford v. Ford*, 578 S.W.3d 356, 366 (Ky. App. 2019). Hence, the October Order is the order on appeal.

-14-

them, regardless of the outcome. In reviewing a trial court's decision on a petition to terminate parental rights, an appellate court must apply the clearly erroneous standard of review. . . . Under this standard, an appellate court is obligated to give a great deal of deference to the trial court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them.

*D.G.R. v. Commonwealth, Cabinet for Health & Fam. Serv.*, 364 S.W.3d 106, 113 (Ky. 2012) (citations omitted).

"Finally, we conduct a *de novo* review of the trial court's application of the law to the established facts to determine whether the ruling was correct as a matter of law. . . . 'Under this standard, we afford no deference to the trial court's application of the law to the facts[.]'" *Glodo v. Evans*, 474 S.W.3d 550, 553 (Ky. App. 2015) (quoting *Laterza v. Commonwealth*, 244 S.W.3d 754, 756 (Ky. App. 2008)).

## ANALYSIS

On appeal, Father argues the family court erred in finding him unfit and denying his motion for immediate custody. We agree.

Giving up a child for adoption is not a unilateral decision. It is abundantly clear from the record that the family court was asking itself the wrong question. The question before the family court was *not*, "Who would be the *better* parent?" The question should have been, "Did the biological father give up or lose the privilege and right to parent?" Simply, no.

-15-

"Kentucky's appellate courts have recognized not only that parents of a child have a statutorily granted superior right to its care and custody, but also that parents have fundamental, basic and constitutionally protected rights to raise their own children." *Moore v. Asente*, 110 S.W.3d 336, 358 (Ky. 2003) (internal quotation marks and citations omitted). As an exception, only if a court deems a person to be a *de facto* custodian, then that *de facto* custodian would have equal standing in a custody matter as a parent. KRS 403.270(1). However, the Bakers were not *de facto* custodians.

"Whether a nonparent is properly classified a *de facto* custodian is a question of law which we review *de novo*." *Hoskins v. Elliott*, 591 S.W.3d 858, 861 (Ky. App. 2019) (citation omitted). In relevant part, KRS 403.270(1) requires nonparents – who are attempting to establish *de facto* custody – to show by clear and convincing evidence that they have been the primary caregiver for, and financial supporter of, the child for six months (for a child under three years old). Crucially, the statute is clear that "[a]ny period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period." KRS 403.270(1)(a); *Jones–Swan v. Luther*, 478 S.W.3d 392, 395 (Ky. App. 2015). Here, the Child was born on June 14; Father, on his own, contacted the Cabinet in August and initiated a paternity action in

-16-

September. As Father initiated a custody proceeding well before the Child was six months old, the Bakers could not qualify as *de facto* custodians. The family court recognized that in January.

It appears the family court had the mistaken impression that the Bakers' possession of the Child or their status "as persons acting as a parent" somehow equated to *de facto* status, but that belief is erroneous. "[U]nlike *de facto* custodian status, a person acting as a parent *does not gain equal standing* to a biological parent." *Appleman v. Gebell*, 706 S.W.3d 223, 227 (Ky. 2024) (emphasis added) (citing *Mullins v. Picklesimer*, 317 S.W.3d 569, 578 (Ky. 2010)). Indeed, as our Supreme Court recently noted, a *de facto* custodian is someone who only has "limited rights based on parents' failure to parent their child." *Lemaster v. Stiltner*, 718 S.W.3d 840, 856 (Ky. 2025). Also, "[t]he parent's superior right of custody is not lost to a non-parent . . . simply because a child is left in the care of the non-parent for a considerable length of time." *Shifflet v. Shifflet*, 891 S.W.2d 392, 394 (Ky. 1995). The family court's reference to the Bakers' "possessory" rights did not elevate them to *de facto* custodians; "finders keepers" is not applicable to parental right determinations in the Commonwealth. *See Moore*, 110 S.W.3d at 358 ( "[W]e hold that 'physical custody' for the purposes of establishing standing requires more than 'actual possession and control of a child' at the time a custody action is commenced . . . .").

-17-

Under these circumstances, the only path for the Bakers to have standing was to establish by clear and convincing evidence that Father was an unfit parent. *See id.* Again, in January and February 2024, the family court specifically denied that it was finding Father unfit. Only upon such a finding could the family court consider whether the Child's best interests were best served by placement with the Bakers.

> For a nonparent to seek custody who does not meet the statutory standard of *de facto* custodian in KRS 403.270, the nonparent must establish either of the following two exceptions to a parent's superior right or entitlement to custody: (1) that the parent is shown by clear and convincing evidence to be an unfit custodian, or (2) that the parent has waived his or her superior right to custody by clear and convincing evidence.

*Glodo*, 474 S.W.3d at 553 (citing *Moore*, 110 S.W.3d at 359; *Truman v. Lillard*, 404 S.W.3d 863 (Ky. App. 2012)). All parties agree waiver is not at issue. Nevertheless, the family court reversed course in October, finding Father unfit despite the absence of any new or additional evidence.

> "[T]he type of evidence that is necessary to show unfitness on the part of the [father] in this custody battle with a third party is: (1) evidence of inflicting or allowing to be inflicted physical injury, emotional harm or sexual abuse; (2) moral delinquency; (3) abandonment; (4) emotional or mental illness; and (5) failure, for reasons other than poverty alone, to provide essential care for the children." Indeed, the nonparent *must show by clear and convincing evidence that the parent has engaged in conduct similar to activity that could result in the termination of parental rights by the state*.

*Id.* at 554 (emphasis added) (first quoting *Davis v. Collinsworth*, 771 S.W.2d 329, 330 (Ky. 1989); and then citing *Moore*, 110 S.W.3d at 360). In light of the family court's handling of this case, this legal standard bears repeating: A finding of parental unfitness requires "clear and convincing evidence that the parent has engaged in conduct similar to activity that could result in the termination of parental rights by the state." *Id.* (citing *Moore*, 110 S.W.3d at 360); *see also Fitch v. Burns*, 782 S.W.2d 618, 620 (Ky. 1989) ("This [parental] right may only be abrogated in an action involving a nonparent seeking custody by a showing of unfitness sufficient to support an involuntary termination of parental rights." (alteration in original) (internal quotation marks and citations omitted)).

To determine what conduct might result in such an outcome, we must consider KRS 625.090, the statute governing the involuntary termination of parental rights. "[T]he bulk of [KRS 625.090], reflects a default preference against termination, which is why it states that no termination of parental rights shall be ordered unless the court makes the statutory findings based on the higher standard of proof of clear and convincing evidence." *D.G.R.*, 364 S.W.3d at 112 (emphasis omitted). The Constitution "requires the state to meet this burden of proof before a parent's rights may be terminated because of the 'fundamental liberty interest' a parent has in the relationship with a child." *Id.* at 112-13 (citing *Santosky v. Kramer*, 455 U.S. 745, 768 (1982)). This matter before us was not a termination

-19-

proceeding, but we nonetheless must discuss KRS 625.090 because determining Father was unfit required a finding that he "engaged in conduct similar to activity that could result in the termination of parental rights by the state." *Moore*, 110 S.W.3d at 360.

Subsection (1) of KRS 625.090[7] requires, among other things, clear and convincing evidence that the child was abused or neglected as defined by KRS 600.020(1). The family court found Father "inflicted abuse upon the [C]hild, by means other than accidental, when he repetitively transported the biological mother to the home of drug dealers to obtain drugs and provided her with the funds to purchase and use the drugs while pregnant with the [C]hild." The family court erroneously claimed that Father "conceded this issue." Father did not stipulate to statutory abuse or neglect. During cross-examination, the Bakers' counsel asked Father to admit he abused his child by providing transportation and money for the Child's pregnant mother. Father denied the abuse and stated he did not know that she was using the money for drugs until later, but with further questioning as to whether this was abusive behavior, he reluctantly agreed, "I guess you could put it that way." We do not believe that statement amounts to a statutory stipulation of abuse. Father was explaining that he was trying to help Mother, trying to give her

---

[7] One or more of the KRS 625.090(2) factors are also required for parental rights termination, but a full recitation of those factors is not necessary for the disposition of this appeal.

money for food, driving her around as she was carless, and he regretted taking her to locations where she obtained drugs. Father's testimony was that he was trying to support his pregnant girlfriend, not that he was trying to support her drug habit.

Relevantly, KRS 600.020(1)(a)(1) defines an "abused or neglected child" as a child whose health or welfare is harmed or threatened with harm when his parent "[i]nflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means[.]" The Bakers did not establish that any harm caused to the Child *by Father* was anything other than accidental. *Mother's* drug use inflicted harm upon the unborn child. *Mother's* actions caused the Child to be exposed in utero to drugs. Our caselaw does not inherently, automatically blame a significant other for their partner's drug use. Mother *did not* state Father encouraged her drug use, instigated her drug use, or joined her in the drug use. Father testified that he did not initially know she was using the money for drugs, did not intend for the money to be used for drugs, and believed to the best of his knowledge that the money was often used correctly for household goods. Moreover, Mother *admitted* Father sent her bank transfers, not cash, for household goods. Mother acknowledged she was not working at the time, and Father was taking care of their household expenses. It is unclear if the family court would have considered *failing to provide financial support* for his pregnant, unemployed girlfriend to be equally inappropriate. The family court's leap that

Father intentionally attempted to terminate the pregnancy while in utero was not based on *any evidence or any testimony*. It was purely an inference made by the family court based on Mother's comment that she and Father discussed abortion at the beginning of her pregnancy.

In essence, finding abuse and/or cause for termination requires significantly more evidence than was presented in the case *sub judice*. Here, there was no evidence at all of abuse since the Child was born. The Cabinet found no basis to deny Father his right to parent. By way of example, in *Glodo v. Evans*, *supra*, this Court held the trial court's "finding" of unfitness was "less a finding than an opinion," and therefore, insufficient to satisfy the clear and convincing standard. 474 S.W.3d at 554. In *Glodo*, the trial court merely stated that the parent was unfit due to her substance abuse, incarceration, and failure to provide for the children for several years, and in closing, noted that "[s]he appears to be doing better recently, but the Court cannot find that she is able to care for these children primarily." *Id*. at 553. On appeal, this Court determined those findings were not "inaccurate" but were instead "insufficient to demonstrate [the mother's] unfitness." *Id*. at 554. The evidence did not meet the "clear and convincing" evidence standard. "The clear and convincing evidence standard requires a party with the burden of proof to produce evidence substantially more persuasive than

-22-

preponderance of the evidence but not beyond a reasonable doubt." *Id.* (citing *Fitch*, 782 S.W.2d at 622).

As another example, in *J.W. v. Cabinet for Health & Family Services*, the Cabinet received a report that a child was being abused or neglected. 719 S.W.3d 70, 74 (Ky. App. 2025). The mother admitted to marijuana and fentanyl use, and the Cabinet alleged that the mother and father "created a risk that an act of sexual abuse, sexual exploitation, or prostitution would be committed upon [the child]." *Id.* The father stipulated to the risk of neglect, and mother stipulated to neglect. *Id.* A mental health evaluator diagnosed the father with "unspecified personality disorder with anti-social features" and "alcohol use disorder – severe." *Id.* at 75. Almost two years after the child was committed to the care of the Cabinet, the Cabinet sought involuntary termination. *Id.* The Cabinet worker testified that the father had not completed a substance abuse assessment, submitted to any drug screens, nor followed the recommendations within his mental health assessment. *Id.* at 75-76. Therefore, the Cabinet advised against reunification with the father. *Id.* at 76. Moreover, the father admitted his driver's license was suspended for DUI convictions, but he could not remember how many such convictions he had. The father worked full-time but had not provided for the child at all and asked the foster parents to provide everything necessary during visits. *Id.* The trial court granted the Cabinet's petition for termination of the father's

parental rights. *Id*. at 76-77. On appeal, this Court determined the Cabinet did not meet its high burden of proof in that the Cabinet's evidence fell short of the clear and convincing standard. *Id*. at 78-81. This outcome was necessary despite this Court's acknowledgement that the father's "attitude [was] less than exemplary" and its conclusion that the father did "not seem suited to have custody of [the] child at this time." *Id*. at 81. This Court reversed the termination judgment and remanded for further custody proceedings. *Id*. at 82.

With all of this in mind, we do not believe the evidence presented in this case was sufficient to support the family court's conclusion that Father is an unfit parent.

Father was present at the hospital for the birth and spent three days in the hospital with Mother. The Bakers knew of this and yet did not name him or serve him with their petition for temporary custody. The affidavit of Mother (in which she waived her superior rights) averred that she knew of no one who might claim any rights to the Child. Her testimony was that either Father or one other man had "impregnated" her. Within weeks of his disassociation with Mother, and within 90 days of the birth, Father contacted the Cabinet to determine if he had any rights.

Father complied with all requests of the Cabinet and did so in a timely manner. The Cabinet repeatedly recommended placement with the Father and

reiterated his complete compliance. He was respectful and cooperative with the Cabinet.

Father has been employed for the duration of these proceedings. When his night shift job interfered with his childcare, he got a new job with daytime work hours and a flexible schedule. He voluntarily took a drug test, passed the drug test, and at no time failed a drug test.

Father stated he had been sober for 18 months prior to the January Hearing. Based on Mother's testimony alone, the family court did not believe Father, as was within its discretion to do. However, the family court then ordered Father to attend AA meetings twice a month, *which he did*. There was no testimony from anyone that Father consumed any alcohol during this custody action; there was no evidence presented of any alcohol related events or arrests of Father; there was no testimony that Father interacted with the Child while intoxicated or smelled of alcohol during exchanges.

The family court never ordered Father to pay child support, but Father provided for the Child while in his care. Father purchased his own car seat, bouncer, changing table, highchair, and more. He provided all the Child's clothing and food while he was with him, often leaving the food and clothing provided by the Bakers untouched as they were unnecessary.

The Bakers testified that Father was not always responsive to text messages, but they did not testify that he was rude, abusive, or combative.

To be clear, the family court found no substantive strikes against Father since the birth of the Child to an addicted Mother. Being late for two exchanges and installing a child car seat incorrectly does not equate to abuse or unfitness. There was no evidence the Child was abandoned, endangered, intentionally abused, or that Father failed to provide the Child with food, clothing, or shelter while in his care. In fact, while the record suggests Father should have supported his pregnant girlfriend differently, there is little evidence to show he was not a dedicated, attentive father.

It is the family court's role to judge the credibility of the witnesses, but it is unclear why the family court based its abuse and unfitness findings *solely* on Mother's testimony, especially considering the fact that she was the *only witness* to have clearly perjured herself. For instance, Mother testified she lived with Father during the pregnancy and only had two sexual partners, but her affidavit submitted with the Bakers' petition for temporary custody stated she "knows of no person not a party to this proceeding who . . . claims to have visitation rights with the infant child[.]" Testimony exposed Mother's inconsistent claims regarding whether she told the Bakers she was unaware of the Child's biological father, or told them that Garth could be the father, or that she *knew*

Garth was the father. As if noting inconsistencies was not enough, Lesley conceded in the subsequent hearing that Mother admitted to her that she had lied at the earlier hearing. Lesley discounted that contact, stating that Mother simply wanted money.

Further, the inappropriateness of the family court's abuse and unfit findings are self-evident within its own orders. The evidence presented to the family court *prior* to the February Order did not result in a finding of abuse or unfitness. Yet, *with no new substantive evidence against Father* (although substantive evidence was presented in *favor* of Father), the family court later reached the conclusion that the evidence warranted a finding of abuse and unfitness in October. If the evidence did not establish abuse or unfitness in February, it is unclear how that same evidence would establish abuse and unfitness in October. Additionally, the October Order permitted Father to continue unsupervised visitation every other weekend. If Father was truly unfit to parent, then the continuation of his unsupervised and overnight visits appears inappropriate. The fact that the family court continued such visitations indicates the unfit finding was not warranted.

Even a cursory review of precedent by the family court would have, could have, and should have prevented this situation. The law in Kentucky regarding biological parental rights is not new, nuanced, confusing, nor

inconsistent. Kentucky courts have clear guidance. What is unclear is why the family court failed to apply our well-established law, and the result of that failure is now tragic for one family. To remove a child from a loving home after *years* is an extreme outcome, but under these circumstances, an outcome *required by law*.

The test is not whether we as an appellate court would have decided the matter differently, but whether the trial court's rulings were clearly erroneous or constituted an abuse of discretion. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982). The family court's finding that Father abused his child by other than accidental means was clearly erroneous because it was not supported by substantial evidence. The family court's custody determination was an abuse of discretion because it was unreasonable, unfair, and unsupported by sound legal principles. Because of the limitations of Father's rights with his child during these proceedings, consideration must now be given as to how to make a transition with as little emotional pain as possible. This Court deeply regrets that the errors and omissions in these legal proceedings have now resulted in causing further turmoil for this child. We can only urge the parties to work together to ease the transition required by law. The Bakers did not qualify as *de facto* custodians per the court's own ruling in January 2024, and no custody hearing should have taken place. Now, two years later, we are forced to reverse and remand for proceedings consistent with the law of this Commonwealth.

**CONCLUSION**

In light of the foregoing, we REVERSE the October Order awarding the Bakers sole custody and any subsequent orders – in any of the three consolidated actions (civil, adoption, and/or juvenile) – that were based on those erroneous findings. We REVERSE and REMAND with instructions to the family court to grant Father's motion for custody.

ALL CONCUR.

BRIEF FOR APPELLANT:

Eric M. Dixon
Corbin, Kentucky

BRIEF FOR APPELLEES:

Hailey Scoville Bonham
London, Kentucky