RENDERED: FEBRUARY 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1247-ME

DAWN SULLIVAN                                                                 APPELLANT

v.
APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JASON S. FLEMING, JUDGE
ACTION NO. 25-D-00333-001

KAYLEE NICHOLE FLANAGAN                                            APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, COMBS, AND EASTON, JUDGES.

COMBS, JUDGE: Appellant, Dawn Sullivan (Dawn), *pro se*, appeals from an

Interpersonal Protective Order (IPO) entered against her in favor of the Appellee,

Kaylee Nichole Flanagan (Kaylee), based upon stalking. After our review, we

affirm.

On September 18, 2025, Kaylee filed a petition/motion for an order of

protection in Christian Circuit Court against Dawn, alleging as follows:

[O]n "9/12-9/18/2025, in Christian County, Kentucky, [Dawn] engaged in act(s) of . . . dating violence and abuse[], stalking, or sexual assault as described below.

. . . .

Me and my ex got into a argument which lead to us splitting. His sister [Dawn] has messaged me on facebook threating to kick my ass and shoot me. I moved out of the house that Sunday into my parents [sic] house. She then posted on Facebook about me being abusive because I have blocked her. I am scared for my life. She owns multiple guns. I have asked her to leave me alone. She has threatened me in the past. Saying Green means go to kick my ass.

On September 30, 2025, the circuit court conducted a hearing on the petition. Both parties were present, pro se. The court read the petition into the record.

Kaylee testified that she was accompanying Dawn, Dawn's brother (Glen), and their father to their grandfather's funeral in North Carolina. At that time, Dawn's brother was Kaylee's fiancé. Glen and Kaylee were arguing over Kaylee's driving while on the way there. Once they got to the hotel room, everything was fine. However, on the way back, there was another argument. This time Dawn joined in. They ended up pulling over because Dawn thought that Kaylee's driving was bad; Dawn then threatened her. The argument continued all the way back to the house. That evening, Kaylee received a Facebook message

-2-

from Dawn. Kaylee testified that she did not respond to the message and blocked

Dawn. She also testified as follows:

> I believe it was the next day she [Dawn] posted on
> Facebook saying that I was abusive to her father and she
> included my workplace in it, your Honor. Her father has
> never been at my workplace. I'm a CAN [(certified
> nursing assistant)]. He has never been a patient of mine.
> I have never received any financial benefit taking care of
> him. I've never been paid. When I did help take care of
> him, I did also ask for help cleaning the house, taking
> him to his doctor's appointments and whatever else. I
> did not receive help from him or her. Between all of this
> I have ended up hospitalized, I had to go in for a severe
> anxiety attack and have suicide ideations.

> The circuit court requested the messages and reviewed them.

Petitioner's Exhibit 1 is the Facebook Messenger message that Dawn sent to

Kaylee as follows in relevant part:

> SUN AT 6:30 P.M.
> Hello Kaylee, this will be the last message you will ever
> receive from me. You are an absolutely horrible person.
> You're the type of person who deserves to be alone for
> the rest of your life . . . . You really need to go see a
> doctor or admit yourself into an institution. I know you
> took that gun out of my bag to use a ploy to get Glen
> [Dawn's brother] to call you and have you come back, as
> it was in there when I took over in Nashville. And you
> knew it wasn't loaded. I honestly should have left you
> on the side of the road when you first started your temper
> tantrums. And I'm pretty sure, the items that went
> missing from my house when you lived there were also
> stolen by you. . . . I can tell you now, you are lucky my
> mind was rational . . . irate but rational because I would
> have lost everything had I done what I wanted. And I
> meant every word I said. And ANYONE, and I mean

-3-

ANYONE, shows up at MY brother's house, the wrath that will ensue will be that of nightmares. . . . Because what comes with me is worse than hell.  You have absolutely no idea who I am.  My reaction to the trip was one I have not had in 13 years.  My brother will be ok, and actually a whole lot better without someone like you . . . .  And that green light talked about?  I have it now.  So PLEASE FAFO.[1] . . .  Do not harass my brother.  He does not need you, and he deserves someone SO MUCH BETTER (And prettier for that matter).  So fuck off.  Don't test it.  Remember, green means go[.]

(Upper-case original.)

Petitioner's Exhibit 2 is the Facebook post which Dawn made on "Clarksville Chat."  It states, "Hello Clarksville! This is just a PSA" in case any members of the chatgroup had family at the post-acute medical facility where Kaylee worked.  Dawn posted that Kaylee was a CNA on night shift and was about to be under investigation for elder abuse against Dawn's father -- that is, as soon as Dawn filed the paperwork.  Dawn stated that the facility had been made aware of her complaint against Kaylee, that Kaylee is still on the schedule, "that she uses drugs," and that she verbally abused Dawn's father.  Dawn proceeded to identify Kaylee by her first and last names.  In multiple exchanges, Dawn posted disparaging comments about Kaylee: that she uses illicit drugs; that she lived with Dawn's brother; that she was supposed to be caring for their father, but that due to

---

[1] "FAFO is 'an expression of warning or schadenfreude.'  It "stands for 'F*** Around, Find Out' (or more politely 'Fool Around, Find Out')."  *FAFO*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/FAFO (last visited Feb. 17, 2026).

-4-

Kaylee's lack of care, Dawn's father had fallen multiple times; and that Kaylee was verbally abusive to him.

Kaylee further testified that Dawn's posting online affected her (Kaylee) and her job -- as well as any future chances of getting a job in Clarksville (Tennessee). Kaylee explained that her CNA license is in Tennessee and that people have already declined to hire her after seeing what was posted online.

Dawn testified. She claimed that the statement in Kaylee's affidavit was "slanderous and not true" -- although Dawn acknowledged that she does own the firearm. She continued her testimony: that they did go to her grandfather's funeral in North Carolina; that on that trip, Kaylee seemed to be in a complete psychosis; that she had lost her mind because she did not get to drive across the state line; that she was trying to jump out of the truck, threatening to kill herself, and wanting them to pull over; and this behavior went on for almost 26 hours. Dawn testified that all this stress and drama activated her brother's PTSD -- as well as her own stress disorder.

Dawn testified that she never threatened to shoot Kaylee and that there was never any threat; that the only thing she told Kaylee was that she should have left her on the side of the road. Dawn admitted having messaged Kaylee on Facebook: "I'm not going to lie about that and I'm not going to lie about putting that post on Clarksville Chat." Kaylee's petition stated that Dawn had been

harassing her "since the 12th."  Addressing that allegation, Dawn testified: "that is impossible, seeing how we were on a trip from the 12th to the 14th, so I don't understand how I was harassing her for those other two days."

Rambling and somewhat disjointed testimony continued.  The court asked Dawn what she meant in the Facebook message by "that green light talked about?  I have it now.  So please FAFO . . . so 'eff' off.  Don't test it.  Remember, green means go."  Dawn explained that she meant, "I was no longer going to tolerate the problem because she was continually harassing my brother."  The court again asked Dawn if her choice of words constituted a threat: "green light talked about . . . also, please FAFO."  Dawn responded, "not a violent threat, not a physical threat, there was no meaning of physical assault or any of that, it was more of a I'm not going to tolerate it anymore."  Dawn testified that she "and her brother say that between each other, that's just something that we've always done, unfortunately I probably shouldn't have said it, it was probably against my better judgment, but that's how I meant it."  Dawn stated that this was "more retaliation due to that Facebook post about her job."

At the conclusion of the hearing, the court made oral findings that an act or threat of violence had occurred and might occur again.  The court entered a one-year IPO order effective until September 30, 2026.  After the court ruled, it advised the parties to wait outside to get a copy of the order.  Kaylee said she had a

-6-

question.  While the court was **still speaking**, Dawn walked out of the courtroom. She later insinuated that an *ex parte* communication had occurred when in fact she left voluntarily.

In its calendar Order entered on September 30, 2025, the circuit court found that "Petitioner was **very credible** and the messenger message was clearly a threat of violence and there was [*sic*] multiple contacts on multiple days."  (Bold-face emphasis added.)  Further, the court found "by a preponderance of the evidence that an act or threat of domestic violence/interpersonal violence occurred and may occur again and that the facts in the Petition were proven by a preponderance of the evidence and incorporated . . . ."

On September 30, 2025, the circuit court entered an IPO on a Form AOC-275.3.  The court found "for Petitioner against Respondent in that it was established, by a preponderance of the evidence, that an act(s) of . . . stalking . . . has occurred and may again occur."  Further, the court found "that the facts in the Petition were proven by a preponderance of the evidence."  The court incorporated the petition as well as its Calendar Order therein as if set forth in their entirety. The court restrained Dawn "from committing further acts of abuse or threats of abuse, stalking or sexual assault[,] from any unauthorized contact with Kaylee, and from going within 300 feet of Kaylee's work and home addresses."

On September 30, 2025, Dawn filed a notice of appeal to this Court. However, Kaylee has not filed a brief. RAP[2] 31(H)(3) provides that:

> If the appellee's brief has not been filed within the time allowed, the court may: (a) accept the appellant's statement of the facts and issues as correct; (b) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (c) regard the appellee's failure as a confession of error and reverse the judgment without considering the merits of the case.

"The decision as to how to proceed in imposing such penalties is a matter committed to our discretion." *Roberts v. Bucci*, 218 S.W.3d 395, 396 (Ky. App. 2007). We note that mail sent by this Court to Kaylee at her Hopkinsville, Kentucky, address was returned as undeliverable. After deliberation, we decline to impose any penalty for her failure to file a brief and proceed with our review.

Dawn first argues that the trial court erred in granting the IPO without sufficient evidence of an immediate and present threat of abuse.

A thorough analysis of the grounds supporting an IPO is set forth by *Halloway v. Simmons* 532 S.W.3d. 158, 161-62 (Ky. App. 2017).

> An IPO allows . . . victims of stalking . . . to petition for protection against their perpetrator. KRS[3] 456.030(1). The IPO statutes are codified in KRS 456. If the court "finds by a preponderance of the evidence that . . . stalking has occurred and may again occur, the court may issue an interpersonal protective order." KRS

[2] Kentucky Rules of Appellate Procedure.

[3] Kentucky Revised Statutes.

456.060(1). Under KRS 456.010(7), "'[s]talking' refers to conduct prohibited as stalking under KRS 508.140 or 508.150." Stalking in the second degree, KRS 508.150(1), requires that an individual intentionally,

> (a) Stalks another person; and

> (b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:

>> 1. Sexual contact as defined in KRS 510.010;

>> 2. Physical injury; or

>> 3. Death[.]

. . . [S]talking is defined in KRS 508.130 as meaning,

> (1)(a) To engage in an intentional course of conduct:

>> 1. Directed at a specific person or persons;

>> 2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and

>> 3. Which serves no legitimate purpose.

> (b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

Where "course of conduct" means two or more acts, to show a pattern of conduct. KRS 508.130(2).

**To summarize, for an individual to be granted an IPO for stalking, he or she must at a minimum prove by a preponderance of the evidence that, an**

-9-

> **individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. KRS 508.130 and KRS 456.060. Additionally, the individual must prove that there was an implicit or explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death. KRS 508.150**.

(Bold face emphasis added.)

In the case before us, the court found Kaylee's testimony to be "very credible." Our role in reviewing cases involving domestic violence is narrowly circumscribed as noted by *Hohman v. Dery*, 371 S.W.3d 780, 782 (Ky. App. 2012):

> On appeal, we are mindful of the trial court's opportunity to assess the credibility of the witnesses, and we will only disturb the lower court's finding of domestic violence if it was clearly erroneous.

(Internal quotations marks and citations omitted.) We also defer to the trial court in assessing witness credibility: "[J]udging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Moore v. Asente*, 110 S.W.3d. 336, 354 (Ky. 2003).

We are satisfied from our review of the record that substantial evidence amply supports the circuit court's finding that an act of stalking has occurred and may again occur. The court properly issued the IPO.

-10-

Dawn's second argument is that the court did not consider a written response that she had filed to Kaylee's petition prior to the hearing.[4] Dawn also takes issue with the court's not needing a call log from her brother's phone. The argument lacks merit. We cannot determine if the court reviewed Dawn's written response; however, Dawn had ample opportunity to testify -- and did testify -- about her version of events. She also submitted three exhibits, one of which is described on the (Respondent's) Exhibit List Form as "Call Log." Dawn's argument is not entirely clear. But if she wanted to submit evidence which she believed that the court excluded, it was incumbent upon her to make an offer of proof to preserve the issue. KRE[5] 103(a)(2). She failed to do so.

Dawn's remaining arguments are lacking in merit are repetitive, and are unpreserved for appellate review. No additional discussion is warranted.

Accordingly, we affirm the entry of the IPO by the Christian Circuit Court.

ALL CONCUR.

---

[4] The unsworn response is date-stamped filed September 19, 2025. It does not contain a certificate of service.

[5] Kentucky Rules of Evidence.

BRIEF FOR APPELLANT:          NO BRIEF FOR APPELLEE.

Dawn Denea Sullivan, *pro se*
Clarksville, Tennessee